UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Officine Tecnosider Srl,<br><br>      Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>      Defendant, | Court No. 23-00001 |

## COMPLAINT

  Plaintiff Officine Tecnosider Srl ("Plaintiff" or "OTS"), by and through their attorneys, allege and state:

## ADMINISTRATIVE DETERMINATION CONTESTED

  1. This action is an appeal from the final results issued by the United States Department of Commerce (the "Department" or "Commerce") in the administrative review of the antidumping order on *Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy* (the "AD Order"). The contested final results cover entries of subject merchandise from Italy during the period of review from May 1, 2020, through April 30, 2021 (the "POR").

  2. Commerce published its contested final results in the Federal Register on December 8, 2022. *See Certain Carbon and Alloy Steel Cut-To-Length Plate From Italy: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 87 Fed. Reg. 75,219 (December 8, 2022) (the "Final Results").

  3. Commerce's final determinations, findings, and conclusions are set out primarily in the issues and decision memorandum for the Final Results. *See Issues and Decision*

*Memorandum for the Final Results of the 2020-2021 Administrative Review of the Antidumping Duty Order on Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy* (December 2, 2022) ("Final IDM").

## JURISDICTION

4.     Plaintiff OTS brings this action pursuant to Section 516A(a)(2) of the Tariff Act of 1930, as amended (the "Act"), 19 U.S.C. § 1516a(a)(2).  OTS contests the Department's Final Results generally and specifically as applied to OTS.  This Court has jurisdiction under 28 U.S.C. § 1581(c).

## STANDING

5.     Plaintiff OTS is an Italian producer and exporter of carbon and alloy steel cut-to-length plate and therefore an interested party under Sections 516A(f)(3) and 771(9) of the Act, codified at 19 U.S.C. §§ 1516a(f)(3) and 1677(9) respectively.  OTS was also a party to the administrative proceeding from which this matter arises.  OTS thus has standing to bring this action under 28 U.S.C. § 2631(c).

## TIMELINESS OF THIS ACTION

6.     Plaintiff filed a Summons with this Court on January 3, 2023, within 30 days from the date of publication of the Final Results.  Plaintiff's Complaint is timely filed pursuant to 19 U.S.C. § 1516a(a)(2)(A) and Rule 3 of the Rules of this Court, which requires that the Complaint be filed within 30 days of the Summons.

## STANDARD OF REVIEW

7.     The Court must remand any administrative determination by Commerce which is "unsupported by substantial evidence on the record as a whole, or is otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).

## STATEMENT OF FACTS

8.  Paragraphs 1 through 7 are realleged and incorporated herein.

9.  On July 6, 2021, Commerce initiated the administrative review of the AD Order covering entries made from May 1, 2020, through April 30, 2021 (the "POR"). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 35,481 (July 6, 2021).

10. On October 15, 2021, OTS submitted its response to Sections B-C of the Department's initial questionnaire.[1] The home market and U.S. sales reported in the Sections B-C response indicated that the price of the subject merchandise has increased dramatically during the POR. *See* BCQR, at Exhibit B-1 & Exhibit C-1.

11. On October 19, 2021, OTS submitted its response to Section D of the Department's initial questionnaire.[2] In that response, OTS reported the quarterly cost for each cut-to-length plate produced during the POR. *See* DQR, at Exhibit D-2 (the "Prod DB and Cost Buildup" sheet). For the cost of production ("COP") data, OTS provided the POR-average costs as requested by Commerce in the questionnaire. *See id*. at D-2 & Exhibit D-1. However, OTS also provided an Excel pivot table that can be used to generate the quarterly average costs with just a few clicks of a button. *See id*. at Exhibit D-2 (the "COM (POR)" sheet).

12. In the Section D response, OTS submitted the monthly quantity and value for three types of steel slabs representing the three largest material inputs utilized in manufacturing the subject merchandise. *See id*, at Exhibit D-4. OTS indicated that steel slab accounts for more than 90% of its total cost of manufacturing ("COM") for the subject merchandise. *See id*. at

---

[1] *See* OTS's Sections B-C Questionnaire Response (October 15, 2021) ("BCQR").
[2] *See* OTS's Sections B-C Questionnaire Response (October 19, 2021) ("DQR").

Exhibit D-10. The monthly figures for the three largest material inputs indicated that OTS's COM has increased dramatically during the POR.

13. In the Section D response, OTS also submitted its entire slab purchase data for the POR. *See id*. at Exhibit D-5 (the "Slab Purchase DB" sheet). In that exhibit, OTS provided the quarterly average price for each slab type purchased during the POR. *See id*. at Exhibit D-5 (the "Slab Purchase Prices" sheet). This exhibit indicated that OTS's COM has increased dramatically during the POR.

14. In the Section D response, OTS also submitted the following information indicating that OTS's COM has increased dramatically during the POR:

    a. cost calculation worksheet for direct materials (Exhibit D-12);

    b. summary of the direct material cost (Exhibit D-2, the "Cost Summary" sheet);

    c. average quarterly direct material cost for each quality code (Exhibit D-2, the "Misc Pivot" sheet); and

    d. quarterly cost for each cut-to-length plate produced during the POR (Exhibit D-2, the "Prod DB and Cost Buildup" sheet).

15. On February 7, 2022, Commerce issued a supplemental Section D questionnaire. In that questionnaire, Commerce requested OTS to explain why OTS "calculated cost data based on quarterly pricing information." On March 7, 2022, OTS explained that it used the quarterly information because "because slab costs vary greatly depending on the type of slab and **fluctuate over time**." *See* OTS's Supplemental Section D Response ("SDQR"), at 8. OTS also clarified that, despite its use of quarterly costs, OTS provided the POR-average costs in the COP data as requested by Commerce. *See id.*

4

16. On June 1, 2022, Commerce issued the preliminary results of the administrative review. *See Certain Carbon and Alloy Steel Cut-To-Length Plate From Italy: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020-2021*, 87 Fed. Reg. 34,246 (June 6, 2022) (the "Prelim Results") and accompanying Issues and Decision Memorandum dated May 31, 2022 ("Prelim IDM").

17. In the Prelim Results, Commerce determined that quarterly cost methodology was not warranted for OTS based on its "review of the quarterly average prices of the three largest material inputs." *See* Prelim IDM, at 19. However, despite its claim that it has reviewed the quarterly average prices of the inputs, Commerce did not disclose its analysis or how that analysis supported its decision:

> We examined NVR's and OTS's cost data. Based on our review of the quarterly average prices of the three largest material inputs for each company, we determined that our quarterly cost methodology is not warranted for either respondent. Therefore, we applied our standard methodology of using annual average costs based on NVR's and OTS's reported data.[3]

18. In the Prelim Results, Commerce compared a majority of OTS's U.S. sales to only two home market sales with much higher prices made close to the end of the POR.[4] This was highly distortive because the price of the subject merchandise has increased dramatically during the POR.[5] Commerce could reduce this distortion by using quarterly cost methodology.[6] If Commerce had used quarterly cost methodology, quarterly price matching would have been automatically invoked.[7]

---

[3] *Id.*
[4] *See* OTS's case brief in the underlying review, dated July 6, 2022, at 9.
[5] *See id.* at 9.
[6] *See id.* at 10-12.
[7] *See* Final IDM, at 32.

19.     On July 6, OTS submitted its case brief contesting Commerce's decision not to use of quarterly cost methodology. In the case brief, OTS showed that the record demonstrates: (1) OTS's COM for the subject merchandise has increased by more than 25% during the POR; and (2) OTS's COM and net price are reasonably correlated.[8] Those two points are the criteria established by Commerce warranting the use of quarter cost methodology. *See e.g.,* Emulsion Styrene-Butadiene Rubber From Brazil: Final Results of Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 30,589 (June 9, 2021), and accompanying Issues and Decision Memorandum (June 3, 2021) ("*Emulsion Styrene-Butadiene Rubber from Brazil*"), at Comment 1.

20.     In its case brief, OTS also showed that the record includes OTS's quarterly costs and an Excel pivot table that can be used to generate the quarterly average costs with just a few clicks of a button.[9] OTS further demonstrated that preliminary margin calculation was highly distortive because Commerce compared a majority of OTS's U.S. sales to only two home market sales with much higher prices made close to the end of the POR despite the fact that the price of the subject merchandise has increased dramatically during the period.[10]

21.     On December 5, 2022, Commerce issued its final results in the administrative review. *See Certain Carbon and Alloy Steel Cut-To-Length Plate From Italy: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 87 Fed. Reg. 75,219 (December 8, 2022) (the "Final Results"), and accompanying Issues and Decision Memorandum dated December 2, 2022 ("Final IDM).

---

[8] *See* OTS's case brief in the underlying review, dated July 6, 2022, at 3-7 and Attachments 1-5.
[9] *See id.* at 7-8 and Attachments 6 & 7.
[10] *See id.* at 10.

22. In the Final Results, Commerce again determined that quarterly cost methodology was not warranted. *See* Final IDM, at 31. However, Commerce did not address whether the record supported the use of quarterly cost methodology. *See id.* at Comment 7. Instead, Commerce for the first time claimed that it did not use the quarterly cost methodology because "OTS did not request that Commerce consider application of the quarterly cost methodology prior to the *Preliminary Results.*" *Id.* at 31. This was contrary to Commerce's prior statement that it has already considered the issue of quarterly cost methodology without OTS's request. *See* Prelim IDM, at 19.

23. In the Final Results, Commerce again did not explain how its "review of the quarterly average prices of the three largest material inputs" supported the decision that quarterly cost methodology was not warranted. *See* Final IDM. at Comment 7. In fact, Commerce did not address any of the factual information on the record regarding the two criteria warranting the use of quarterly cost methodology. *See id.*

## COUNT I

24. Paragraphs 1 through 23 are realleged and incorporated herein.

25. In the Final Results, Commerce unlawfully determined that quarterly cost mythology was not warranted because "OTS did not request that Commerce consider application of the quarterly cost methodology prior to the *Preliminary Results.*" Final IDM, at 31.

26. "As noted in *Hot-Rolled Steel from Turkey* and *Union Steel Manufacturing Company Ltd. v. United States*, the 'Department has established a predictable and consistent practice for determining whether or not {Commerce} should deviate from the normal methodology of calculating an annual weight average cost and resort to an alternative cost reporting methodology.'" Dioctyl Terephthalate from the Republic of Korea: Final

Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 82 Fed. Reg. 28,824 (June 26, 2017), and accompanying Issues and Decision Memorandum (June 19, 2017) ("*Dioctyl Terephthalate from Korea*"), at 8 (citing *Hot-Rolled Steel from Turkey*[11] and *Union Steel v. U.S.*[12]). "When the significance of cost changes and linkage between changes in cost and prices tests are met, the Department applies its quarterly cost methodology, and there is no need for the respondent to request that the Department undertake such analysis." *Id.* at 9.

27.    "{I}t is well-established that 'an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.'" *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). In *Dioctyl Terephthalate from Korea*, Commerce established a practice that there is no need for a respondent to request the use of quarterly cost methodology in order for the agency to examine that issue.[13] In the underlying review, Commerce at first acted consistently with its established practice by stating in the Prelim Results that it has examined the issue of quarterly cost methodology without OTS's request. *See* Prelim IDM, at 19. However, in the Final Results, Commerce arbitrarily and capriciously departed from its established practice without any explanation by determining that quarterly cost methodology was not warranted because OTS did not make such request before the preliminary results. *See* Final IDM, at 31.

---

[11] Certain Hot-Rolled Steel Flat Products from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 53428 (August 12, 2016) and accompanying Issues and Decision Memorandum ("*Hot-Rolled Steel from Turkey*")

[12] *Union Steel Manufacturing Company Ltd. v. United States*, 190 F. Supp. 3d 1326, 1339 (CIT 2016))

[13] "An action ... becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of a change, reasonably to expect adherence to the {particular action} or procedure." *Ranchers-Cattlemen Action Legal Found. v. United States*, 74 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 1999).

28. In the Prelim Results, Commerce determined without any request from OTS that quarterly cost methodology was not warranted. OTS contested this decision at the first available opportunity in its case brief in the underlying proceeding. Therefore, what Commerce described as untimely "request" to use quarterly costs was in fact OTS's appeal to Commerce's decision in the Prelim Results. Commerce cannot reject an argument against a decision it made in the Prelim Results by alleging that it is an untimely "request."

29. In the Final Results, Commerce claimed that OTS's request for quarterly cost methodology was untimely because "at this late stage in the proceeding, any such analysis would no longer be subject to the questionnaire and verification process to test its accuracy." Final IDM, at 31. This is contrary to Commerce's statement that it has already conducted such analysis before issuing the preliminary results. *See* Prelim IDM, at 19. Moreover, Commerce has used its questionnaires and verification process to test the accuracy of the quarterly costs reported by OTS.[14] Therefore, the fact that the record did not include the weighted average version of the quarterly costs was irrelevant for the purposes of testing accuracy of the reported costs.

30. For the above reasons, Commerce's decision to reject quarterly cost methodology based on OTS's failure to make a request was arbitrary, capricious, and unsupported by substantial evidence.

**COUNT II**

31. Paragraphs 1 through 30 are realleged and incorporated herein.

---

[14] For example, Commerce verified OTS's reported quarterly slab prices by examining the purchase record for December 2020. *See* OTS's In Lieu of Verification Questionnaire Response (June 13, 2022), at 5.

32. In the underlying review, Commerce unlawfully determined that quarterly cost mythology was not warranted based on its "review of the quarterly average prices of the three largest material inputs." Prelim IDM, at 19.

33. In prior cases including *Dioctyl Terephthalate from Korea*, *Emulsion Styrene-Butadiene Rubber from Brazil,* and *Hot-Rolled Steel from Turkey*, Commerce established a practice for using quarterly cost methodology if: (1) a respondent's cost of manufacturing has changed by more than 25% during the period of review and (2) the cost of manufacturing and net price of the subject merchandise are reasonably correlated. In the underlying review, the record clearly demonstrates that both of those conditions are met.[15]

34. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1369 (Fed. Cir. 2015) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) ("*Universal Camera*"). "Support by substantial evidence must be determined on the entirety of the record, considering the evidence that detracts from the agency's conclusion." *See id.* (citing *Universal Camera*, at 488). "An agency acts arbitrarily, and therefore unreasonably, when it 'entirely fail{s} to consider an important aspect of the problem' or 'offer{s} an explanation for its decision that runs counter to the evidence before {it}." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 70 F. Supp. 3d 1328, 1335, n.33 (Ct. Int'l Trade 2015) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29).

35. Therefore, Commerce's decision to reject quarterly cost methodology based on its "review of the quarterly average prices of the three largest material inputs" was arbitrary, capricious, and unsupported by substantial evidence.

---

[15] *See* OTS's case brief in the underlying review, dated July 6, 2022, at 3-7 and Attachments 1-5.

# COUNT III

36. Paragraphs 1 through 35 are realleged and incorporated herein.

37. Commerce must determine dumping margins as accurately as possible. *See Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,* 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible."). In the underlying review, Commerce created a serious distortion in it margin calculation by comparing a majority of OTS's U.S. sales to only two home market sales with much higher prices made close to the end of the POR, despite the fact that the price of the subject merchandise has increased dramatically during this period.[16] Commerce could reduce this distortion by using quarterly cost methodology.[17] If Commerce had used quarterly cost methodology, quarterly price matching would have been automatically invoked. *See* Final IDM, at 32. Therefore, Commerce's failure to conduct a proper analysis regarding the use of quarterly cost methodology resulted in an inaccurate margin calculation.

38. In the Final Results, Commerce claimed that OTS did not report quarterly costs. This is unsupported by substantial evidence. OTS reported the quarterly costs for every cut-to-length plate produced during the POR.[18] Despite its claim that "it is not Commerce's responsibility to assemble or manipulate a respondent's reported raw data in such a way to make the case for quarterly costs," Commerce regularly adjusts or revises a respondent's data to improve the accuracy of its margin calculation.[19] Moreover, Commerce claimed that it has

---

[16] *See* OTS's case brief in the underlying review, dated July 6, 2022, at 9 & 10.
[17] See OTS's case brief in the underlying review, dated July 6, 2022, at 11 & 12.
[18] *See* DQR, at Exhibit D-2 (the "Prod DB and Cost Buildup" sheet).
[19] *See e.g.,* Steel Concrete Reinforcing Bar From Mexico: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021, 87 Fed. Reg. 75,032 (December 7, 2022), and accompanying Acerero Preliminary Analysis Memorandum (November 30, 2022) (revising the respondent's sales data using Excel pivot tables).

conducted the necessary analysis to determine whether quarterly cost methodology was warranted before the Prelim Results were issued. *See* Prelim IDM, at 19. If this statement was correct, Commerce had ample opportunity to request OTS to provide the weighted average version of the quarterly costs. When additional data compilations are necessary, Commerce regularly issues post-preliminary questionnaires to request additional information from respondents.[20]

39.     In the underlying review, OTS explained how Commerce could use the Excel pivot table on the record to weight-average the reported quarterly costs.[21] However, Commerce claimed that OTS provided "insufficient explanation of how to combine the three parts of the data in this exhibit into one unified data set." Final IDM, at 32. This is unsupported by substantial evidence because the Excel pivot table could be used without combining the three parts. Commerce also failed to consider that its online platform (i.e., ACCESS) did not allow OTS to upload the data in one file due to a size limit.

40.     For the above reasons, Commerce failed to perform its statutory obligation to calculate an accurate dumping margin.

---

[20] *See e.g.,* Oil Country Tubular Goods From Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 87 Fed. Reg. 59,054 (September 29, 2022), and accompanying Issues and Decision Memorandum (September 23, 2023), at 1 & 2 ("Following the Preliminary Determination, Commerce issued a post-preliminary determination supplemental questionnaire to Siderca, regarding certain further manufacturing issues."); *see also* Prestressed Concrete Steel Wire Strand From Thailand: Final Results of Antidumping Duty Administrative Review; 2020, 87 Fed. Reg. 48,152 (August 8, 2022), and accompanying Issues and Decision Memorandum (August 1, 2022), at 5 ("Additionally, in a post-preliminary supplemental questionnaire, we asked SIW to correct this error in the sales reconciliation worksheet, which it did in its response.")
[21] *See* OTS's case brief in the underlying review, dated July 6, 2022, at 7-8 and Attachments 6 & 7.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in favor of Plaintiff, declare that Commerce erred in the final results in the subject administrative review as alleged herein, and remand to the Department with instructions to publish new final results in conformity with the opinion of this Court.  Specifically, the Plaintiff prays that this Court remand Commerce to determine based on the record evidence that quarterly cost quarterly cost methodology is warranted in the subject administrative review.  Plaintiff otherwise requests that the Court grant such additional relief as the Court may deem just and proper.

                                  Respectfully submitted,

                                  */s/ Daniel Cannistra*
                                  Daniel Cannistra, Esq.
                                  Pierce Lee, Esq.

                                  Crowell & Moring
                                  1001 Pennsylvania Ave., N.W.
                                  Washington, D.C.  20004

                                  Counsel for Plaintiff Officine Tecnosider Srl

Dated:  January 25, 2023

## CERTIFICATE OF SERVICE

Pursuant to Rule 3(f) of the Court of International Trade, I, Daniel Cannistra, hereby certify that I have caused copies of the Complaint, in Officine Tecnosider Srl v. United States, Case No. 23-00001, be served upon the parties in the administrative proceeding, by the U.S. certified mail, return receipt requested on January 25, 2023.

**UPON THE UNITED STATES:**

Augustus Jeffrey Golden
U.S. Department of Justice
Civil Division, National Courts Section
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

**UPON THE DEPARTMENT OF COMMERCE:**

Robert Heilferty, Esq.
Chief Counsel
Office of the Chief Counsel for Trade Enforcement and Compliance International Trade Administration
U.S. Department of Commerce
14th Street and Constitution Ave., NW
Washington, DC 20230

**Other Interested Parties**

Roger B. Schagrin, Esq.
Representative of SSAB
Schagrin Associates
900 Seventh Street, NW, Suite 500
Washington, DC 20001
Email: rschagrin@schagrinassociates.com

Christopher B Weld, Esq.
Representative of Nucor Corporation
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
Email: cweld@wiley.law

                                                 /s/ *Daniel Cannistra*
                                                 Daniel Cannistra