# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

# BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

|  |  |
|---|---|
| OFFICINE TECNOSIDER SRL, | |
| *Plaintiff,* | |
| v. | |
| UNITED STATES, | Court No. 23-00001 |
| *Defendant,* | ***PUBLIC VERSION*** |
| and | |
| NUCOR CORPORATION, | |
| *Defendant-Intervenor.* | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## RULE 56. 2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel J. Cannistra
Pierce J. Lee

Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 624-2902
Email: dcannistra@crowell.com

*Counsel for Plaintiff Officine
Tecnosider Srl*

Dated:      March 17, 2023

## TABLE OF CONTENTS

**Page No.**

PLAINTIFFS' STATEMENT PURSUANT TO US CIT RULE 56.2(C) .............. 1

I. Administrative Determination to Be Reviewed ................................. 1

II. Issues of Law and Fact Presented ..................................................... 2

III. Reasons for Contesting the Final Results ...................................... 3

IV. Standard of Review ......................................................................... 3

STATEMENT OF FACTS ......................................................................... 6

SUMMARY OF ARGUMENT .................................................................. 12

ARGUMENTS .......................................................................................... 14

I. Commerce established a clear and predictable practice ................... 14

    A.    There are two criteria for applying the quarterly cost methodology ........ 14

    B.    No request is required for application of the quarterly cost methodology ................................................................................. 16

II. Commerce deviated from its established practice ........................... 18

    A.    Commerce failed to consider the two criteria .......................... 18

        i.    OTS's cost of manufacturing increased by more than 25% ............... 18

        ii.    OTS's costs and sales prices are reasonably correlated ..................... 19

    B.    Commerce's failure to apply the quarterly cost methodology resulted in a serious distortion in the margin calculation ........................................... 20

IV. Commerce failed to provide a reasonable explanation for its deviation from the established practice ........................................................................ 24

    A.    OTS was not required to request application of the quarterly cost methodology .................................................................................... 25

    B.    OTS timely challenged Commerce's preliminary decision .................... 28

    C.    Commerce verified the source data for OTS's quarterly costs ............... 30

    D.    The record included OTS's quarterly costs ............................................ 31

CONCLUSION .......................................................................................... 33

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*,
  412 U.S. 800 (1973).................................................................................................24

*Ausimont USA, Inc. v. United States*,
  882 F. Supp. 1087 (Ct. Int'l Trade 1995) ................................................................3

*Baroque Timber Indus. (Zhongshan) Co. v. United States*,
  971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014) .........................................................28

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
  701 F.3d 1367 (Fed. Cir. 2012)................................................................................4

*Chevron U.S.A. Inc. v. Natural Res. Def. Council*,
  467 U.S. 837 (1984)..................................................................................................4

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)..................................................................................................3

*CS Wind Vietnam Co. v. United States*,
  832 F.3d 1367 (Fed. Cir. 2016)................................................................................3

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)..................................................................................................4

*Hartford Fire Ins. Co. v. United States*,
  772 F.3d 1281 (Fed. Cir. 2014)................................................................................5

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)....................................................................................................4

*NTN Bearing Corp. of Am. v. United States*,
  186 F. Supp. 2d 1257 (Ct. Int'l Trade 2002) ...........................................................4

*Ranchers-Cattlemen Action Legal Found. v. United States*,
  74 F. Supp. 2d 1353 (Ct. Int'l Trade 1999) ...........................................................16

*SeAH Steel Corp. v. United States*,
  704 F. Supp. 2d 1353 (Ct. Intl. Trade 2010).........................................................15

*Shanghai Foreign Trade Enters. Co. v. United States*,
  318 F. Supp. 2d 1339 (Ct. Intl. Trade 2004).........................................................29

*SKF USA Inc. v. United States*,
 263 F.3d 1369 (Fed. Cir. 2001)..................................................................25, 26

*Union Steel Mfg. Co. v. United States*,
 190 F. Supp. 3d 1326 (Ct. Intl. Trade 2016)..........................................24

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
 716 F.3d 1370 (Fed. Cir. 2013)..................................................................24

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................3

19 U.S.C. § 1677b(b) ..............................................................................14

19 U.S.C. § 1677b(b)(3) ..........................................................................14

Tariff Act of 1930 Section 773(b)(1)......................................................14

**Other Authorities**

19 C.F.R. 351.309 ....................................................................................29

19 C.F.R. 351.414(e)................................................................................22

*Antidumping Methodologies for Proceedings that Involve Significant Cost
 Changes Throughout the Period of Investigation (POI)/Period of Review
 (POR) that May Require Using Shorter Cost Averaging Periods; Request for
 Comment*, 73 Fed. Reg. 26,364 (May 9, 2008).......................................14

*Certain Hot-Rolled Steel Flat Products from the Republic of Turkey: Final
 Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 53,428 (August
 12, 2016) and accompanying Issues and Decision Memorandum...........................14

*Certain Hot-Rolled Steel Flat Products from the Republic of Turkey: Final
 Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 53,428 (August
 12, 2016) and accompanying Issues and Decision Memorandum..........................15, 17, 27

*Dioctyl Terephthalate from the Republic of Korea: Final Determination of Sales
 at Less Than Fair Value and Final Negative Determination of Critical
 Circumstances*, 82 Fed. Reg. 28,824 (June 26, 2017) and accompanying
 Issues and Decision Memorandum ...........................................................16

*Emulsion Styrene-Butadiene Rubber From Brazil: Final Results of Antidumping
 Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 30,589 (June 9, 2021),
 and accompanying Issues and Decision Memorandum.......................................10

*Oil Country Tubular Goods From Argentina: Final Affirmative Determination of
Sales at Less Than Fair Value and Final Negative Determination of Critical
Circumstances*, 87 Fed. Reg. 59,054 (September 29, 2022) and accompanying
Issues and Decision Memorandum ............................................................................32

*Prestressed Concrete Steel Wire Strand From Thailand: Final Results of
Antidumping Duty Administrative Review; 2020*, 87 Fed. Reg. 48,152 (August
8, 2022), and accompanying Issues and Decision Memorandum...........................................32

*Steel Concrete Reinforcing Bar From Mexico: Preliminary Results of
Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 75,032
(December 7, 2022), and accompanying Acerero Preliminary Analysis
Memorandum ............................................................................................................33

## PLAINTIFFS' STATEMENT PURSUANT TO US CIT RULE 56.2(C)

### I. Administrative Determination to Be Reviewed

Plaintiff Officine Tecnosider Srl ("Plaintiff" or "OTS") contests the final results of the administrative review of the antidumping duty ("AD") order on certain carbon and alloy steel cut-to-length ("CTL") plate from Italy covering May 1, 2020 through April 30, 2021 period of review ("POR"). *See Certain Carbon and Alloy Steel Cut-To-Length Plate From Italy: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021,* 87 Fed. Reg. 75,219 (December 8, 2022) ("Final Results"). Appx2302-Appx2304. Plaintiff challenges the factual and legal conclusions of the U.S. Department of Commerce (the "Department" or "Commerce") in the Final Results as set forth in the associated "Issues and Decision Memorandum." *See Issues and Decision Memorandum for the Final Results of the 2020-2021 Administrative Review of the Antidumping Duty Order on Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy* (December 2, 2022) ("Final IDM"). Appx2305-Appx2337.

**II. Issues of Law and Fact Presented**

1. **Does Commerce have an established practice for applying the quarterly cost methodology?**

   Yes, Commerce established two criteria for applying the quarterly cost methodology: (1) the change in the respondent's cost of manufacturing is significant, and (2) the respondent's costs and sales prices are reasonably linked.

2. **Did Commerce consider the two criteria for applying the quarterly cost methodology?**

   No, Commerce did not consider the two criteria. Nothing in the record suggests that Commerce conducted a meaning analysis regarding those criteria.

3. **Did Commerce deviate from the established practice regarding the application of the quarterly cost methodology?**

   Yes, Commerce deviated from its established practice by failing to consider the two criteria. Moreover, the record demonstrates that the two criteria are met.

4. **Did Commerce provide a reasonable explanation regarding its deviation of the established practice?**

   No, Commerce did not provide a reasonable explanation. Commerce faulted OTS for not making a request when no request is required for application of the quarterly cost methodology.

5. **Did Commerce deviate from its established practice without providing a reasonable explanation?**

   Yes, Commerce unlawfully deviated from its established practice regarding application of the quarterly cost methodology without providing a reasonable explanation.

### III. Reasons for Contesting the Final Results

Plaintiff contests the Final Results because Commerce's factual and legal conclusions are not supported by substantial evidence and otherwise not in accordance with the law.  Commerce unlawfully decided not to use the quarterly cost methodology.  In making the decision, Commerce unlawfully deviated from its established practice by failing to consider the two criteria for applying the quarterly cost methodology.  Commerce also failed to provide any reasonable explanation for its decision.

### IV. Standard of Review

The Court will hold unlawful agency determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Ausimont USA, Inc. v. United States*, 882 F. Supp. 1087, 1092 (Ct. Int'l Trade 1995).  Substantial evidence means that there is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

The standard of review requires the agency to take into account "whatever in the record fairly detracts" from the evidence adduced in support of the agency's conclusion. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir.

2016) (citing *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)).  The standard of review also requires that the agency grapple with all "important aspect{s} of the problem" before it.  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In applying its standard of review involving Commerce's interpretation of a statute, the Court must do so within the framework established by *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984).  Under *Chevron*, the Court must first ask whether Congress has directly spoken to the precise question at issue.  If Congress has done so, the inquiry ends; the Court "must give effect to the unambiguously expressed intent of Congress."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467 U.S. at 842-43).

Commerce has considerable discretion to develop methodologies when administering the antidumping laws.  *See NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257, 1285 (Ct. Int'l Trade 2002) (citing *Federal-Mogul Corp. v. United States*, 18 C.I.T. 785, 807–08, 862 F. Supp. 384, 405 (1994) (internal citations omitted); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984)).  However, Commerce must act reasonably and may not be arbitrary and capricious. *See e.g.*, *Changzhou Wujin Fine Chem. Factory Co. v.*

*United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ("Commerce's decision will be set aside if it is arbitrary and capricious.").  "{A} clear error of judgment occurs when an action is arbitrary, fanciful, or clearly unreasonable." (quoting *Robert Bosch LLC v. Pylon Mfg. Corp.,* 659 F.3d 1142, 1147-48 (Fed. Cir. 2011) (internal citations and quotations omitted) *Hartford Fire Ins. Co. v. United States*, 772 F.3d 1281, 1286 (Fed. Cir. 2014).

## STATEMENT OF FACTS

Plaintiff OTS is an Italian producer and exporter of carbon and alloy steel cut-to-length ("CTL") plates.  On July 6, 2021, Commerce initiated the administrative review of the antidumping duty order on *Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy*, covering entries made from May 1, 2020, through April 30, 2021 (the "POR").  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 35,481 (July 6, 2021).

On October 15, 2021, OTS submitted its response to Sections B-C of the Department's initial questionnaire.[1]  The home market and U.S. sales reported in the Sections B-C response indicated that the price of the subject merchandise increased dramatically during the POR.[2]

On October 19, 2021, OTS submitted its response to Section D of the Department's initial questionnaire.[3]  In that response, OTS reported its quarterly cost of production ("COP") for each CTL plate produced during the POR. Appx81181-Appx81187.  Every CTL plate produced by OTS has a unique serial number.  *Id.*  For each serial number, OTS reported the quarterly COP for direct

---

[1] *See* OTS's Sections B-C Questionnaire Response (October 15, 2021) ("BCQR").  Appx80611-Appx81134.
[2] *See* OTS's administrative case brief (July 6, 2022).  Appx82401-Appx82403.
[3] *See* OTS's Section D Questionnaire Response (October 19, 2021) ("DQR").  Appx81135-Appx81389.

material, labor, variable overhead, and fixed overhead.  *Id.*  OTS also provided the POR-average costs as requested by Commerce in the questionnaire.  Appx81176-Appx81177.  Additionally, OTS also provided an Excel pivot table that could be used to weight-average the reported COP on a quarterly basis.  Appx81179-Appx81180.

In the Section D response, OTS submitted the monthly quantity and value for three types of steel slabs representing the three largest material inputs utilized in manufacturing the subject merchandise.  Appx81204.  OTS indicated that steel slab accounts for [   ]% of its total cost of manufacturing ("COM") for the subject merchandise.  Appx81257.  The monthly figures for the three largest material inputs indicated that OTS's COM increased dramatically during the POR. Appx81204.

In the Section D response, OTS also submitted its entire slab purchase data for the POR.  Appx81205- Appx81210.  Additionally, OTS provided the quarterly average price for each slab type purchased during the POR.  Appx81212.  This exhibit indicated that OTS's COM increased dramatically during the POR.  *Id.*

Furthermore, OTS submitted the following information, all of which indicated that OTS's COM increased dramatically during the POR:

- cost calculation worksheet for direct materials (Appx81268-Appx81269);

- quarterly direct material costs for each slab type (Appx81188);

- quarterly direct material costs for each quality code (Appx81197); and

- quarterly cost of production for each cut-to-length plate produced during the POR (Appx81181-Appx81187).

On February 7, 2022, Commerce issued a supplemental Section D questionnaire.[4]  In that questionnaire, Commerce requested OTS to explain why OTS "calculated cost data based on quarterly pricing information."  Appx81423. On March 7, 2022, OTS explained that it used the quarterly information because "because slab costs vary greatly depending on the type of slab and *fluctuate over time*."  Appx81573.  OTS also clarified that, despite its use of the quarterly costs, OTS also provided the POR-average COP data as requested by Commerce.  *Id.*

On June 1, 2022, Commerce issued the preliminary results of the administrative review.  *See Certain Carbon and Alloy Steel Cut-To-Length Plate From Italy: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020-2021*, 87 Fed. Reg. 34,246 (June 6, 2022) (the "Prelim Results") and accompanying Issues and Decision

---

[4] Appx81417-Appx81426.

Memorandum dated May 31, 2022 ("Prelim IDM").  Appx2261-Appx2264;

Appx2271-Appx2290.

In the Prelim Results, Commerce decided not to use the quarterly cost

methodology.  Appx2289.  However, despite its claim that it has reviewed the

quarterly average prices of the inputs, Commerce did not disclose its analysis or

how that analysis supported the decision:

> We examined NVR's and OTS's cost data. Based on our review of the
> quarterly average prices of the three largest material inputs for each
> company, we determined that our quarterly cost methodology is not
> warranted for either respondent. Therefore, we applied our standard
> methodology of using annual average costs based on NVR's and
> OTS's reported data.

*Id.*  Due to Commerce's decision to reject the quarterly cost methodology and

instead use the POR-average costs, most of OTS's home market sales were

considered below-cost-sales and were disregarded in the margin analysis.[5]  As a

result, Commerce compared a majority of OTS's U.S. sales to only two home

market sales made near the end of the POR.[6]  Those two home market sales had

much higher prices than other home market sales because the price of the subject

merchandise increased significantly during the POR.[7]

---

[5] *See* OTS's administrative case brief (July 6, 2022).  Appx82385-Appx82389.
[6] *Id.*
[7] *Id.*

9

On July 6, 2022, OTS submitted its case brief contesting Commerce's decision not to use of the quarterly cost methodology.[8]  In the case brief, OTS demonstrated: (1) OTS's cost of manufacturing for the subject merchandise increased by more than 25% during the POR; and (2) OTS's costs and sales prices are reasonably correlated.[9]  These are the criteria established by Commerce for applying the quarterly cost methodology.  *See e.g., Emulsion Styrene-Butadiene Rubber From Brazil: Final Results of Antidumping Duty Administrative Review*; 2018-2019, 86 Fed. Reg. 30,589 (June 9, 2021), and accompanying Issues and Decision Memorandum (June 3, 2021) ("*ESBR from Brazil*"), at Comment 1.

In its case brief, OTS also showed that the record includes OTS's quarterly COP for every CTL plate produced during the POR and an Excel pivot table that can be used to weight-average the quarterly COP.[10]  OTS further demonstrated that the use of the POR-average costs (instead of the quarterly costs) resulted in a serious distortion in the margin calculation.[11]

On December 5, 2022, Commerce issued its final results in the administrative review.  *See Certain Carbon and Alloy Steel Cut-To-Length Plate From Italy: Final Results of Antidumping Duty Administrative Review and Final*

---

[8] *Id.* Appx82372-Appx82411.
[9] *Id.* Appx82381-Appx82384.
[10] *Id.* Appx82384-Appx82385
[11] *Id.* Appx82385-Appx82389.

*Determination of No Shipments; 2020-2021*, 87 Fed. Reg. 75,219 (December 8, 2022) (the "Final Results"), and accompanying Issues and Decision Memorandum dated December 2, 2022 ("Final IDM").  Appx2302-Appx2304; Appx2305-Appx2337.

In the Final Results, Commerce again decided not to use the quarterly cost methodology.  Appx2335.  However, Commerce did not address whether the record supported the use of the quarterly cost methodology.  *Id.*  Instead, Commerce for the first time claimed that it did not use the quarterly cost methodology because "OTS did not request that Commerce consider application of the quarterly cost methodology prior to the *Preliminary Results." Id.*  This was inconsistent with Commerce's statement in the Prelim Results that it considered the issue without OTS's request.  Appx2289.

In the Final Results, Commerce again did not explain how its "review of the quarterly average prices of the three largest material inputs" supported the decision against the use of the quarterly cost methodology.  Appx2335.  In fact, Commerce did not address any of the factual information on the record regarding the two criteria warranting the use of the quarterly cost methodology.  *Id.*

# SUMMARY OF ARGUMENT

This case is a classic example of an administrative agency deviating from its established practice without providing a reasonable explanation.  In the underlying proceeding, Commerce deviated from its established practice regarding application of the quarterly cost methodology, rendering the decision arbitrary, capricious, and otherwise not in accordance with law.

Commerce calculates a dumping margin by comparing a respondent's U.S. prices to normal values, which are usually based on the prices of the respondent's home market sales.  In calculating the normal values, Commerce disregards home market sales that are found to be made at prices below their cost of production ("COP").  To determine the "below-cost" sales, Commerce normally uses the weighted-average COP for the entire period of review ("POR").  However, Commerce established two criteria for applying the quarterly cost methodology: (1) the change in the respondent's cost of manufacturing is significant, and (2) the respondent's sales prices are reasonably linked with its cost of manufacturing.  In this case, both of those conditions are met.

Commerce deviated from its established practice by failing to consider the two criteria.  In the Prelim Results, Commerce determined that the quarterly cost methodology is not warranted even though the record demonstrated the opposite.

12

When OTS timely challenged the decision in its administrative case brief, Commerce faulted OTS for making an untimely "request."  This was unreasonable because Commerce never requires a party to make a request regarding application of the quarterly cost methodology.  Moreover, Commerce failed to address any of the factual evidence concerning the two established criteria.  Therefore, Commerce failed to provide a reasonable explanation for its deviation from the established practice.

## ARGUMENTS

### I. Commerce established a clear and predictable practice

#### A. There are two criteria for applying the quarterly cost methodology

Section 773(b)(1) of the Tariff Act of 1930, as amended (the "Act")

allows the Department of Commerce (the "Department" or "Commerce"), in

certain circumstances, to disregard comparison-market sales made at less than

the cost of production ("COP") when determining normal value.  *See* 19 U.S.C.

§ 1677b(b) (the "below-cost" test).  The statute provides that the COP is

calculated using a "period which would ordinarily permit the production" of the

foreign like product.[12]  However, there is no guidance regarding whether

Commerce may use average costs for the entire period of review ("POR") or

shorter periods within the POR.[13]  Commerce addressed this issue by

establishing a predictable and consistent practice for determining whether or not

the agency should deviate from the single cost-averaging methodology and

resort to an alternative method such as the quarterly cost methodology.  *See*

*ESBR from Brazil*, at Comment 1; *see also Certain Hot-Rolled Steel Flat*

---

[12] Section 773(b)(3) of the Act requires the COP to include the cost of materials and processing during "a period which would ordinarily permit the production of that foreign like product in the ordinary cost of business."  19 U.S.C. § 1677b(b)(3).

[13] *See Antidumping Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/Period of Review (POR) that May Require Using Shorter Cost Averaging Periods; Request for Comment*, 73 Fed. Reg. 26,364, 26,365 (May 9, 2008).

*Products from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 53,428 (August 12, 2016) (*Hot-Rolled Steel from Turkey*), and accompanying Issues and Decision Memorandum at Comment 6;

Commerce established two criteria for applying the quarterly cost methodology: (1) the change in the cost of manufacturing ("COM") recognized by the respondent during the POR is significant, and (2) the respondent's costs and sales prices are reasonably linked. *See id.* For the first criterion, Commerce established 25 percent as the threshold for determining whether the change in COM is deemed significant. *See id.* With regard to the second criterion, Commerce's definition of linkage does not require direct traceability between specific sales and their specific production costs. *See id.* Instead, Commerce typically bases its finding on whether there are elements which would indicate a reasonably positive correlation between the costs and the sales prices, such as whether the magnitude of the changes in costs and prices were comparable, whether the prices and costs moved in the same direction for the majority of the quarters, and whether the slope line for the costs and sales prices trended consistently. *See id.* Commerce's use of these criteria has been upheld by this Court in *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353 (Ct. Intl. Trade 2010).

15

### B. No request is required for application of the quarterly cost methodology

"An action ... becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of a change, reasonably to expect adherence to the {particular action} or procedure." *Ranchers-Cattlemen Action Legal Found. v. United States*, 74 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 1999).  In many prior administrative proceedings, Commerce established a practice for applying the quarterly cost methodology whether or not a party makes such request.  Commerce has even explicitly described this practice as follows:

> When the significance of cost changes and linkage between changes in cost and prices tests are met, the Department applies its quarterly cost methodology, and **there is no need for the respondent to request that the Department undertake such analysis**.

*Dioctyl Terephthalate from the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 28,824 (June 26, 2017), and accompanying Issues and Decision Memorandum (June 19, 2017) ("*Dioctyl Terephthalate from Korea*"), at 8-9 (emphasis added).  Commerce also stated that its "analysis is not dependent on whether a party requests a different methodology."  *Id.* at 5-6.

16

Furthermore, Commerce established a practice of considering the application of the quarterly cost methodology whether or not the respondent provides its quarterly weighted-average costs.  Commerce has described this practice as follows:

> However, because the Department's normal methodology is to use annual average cost, in most cases the record does not contain a quarterly cost database. Consequently, to allow the Department to test for significant cost changes and **to alleviate the burden of a respondent having to report both an annual weighted-average and quarterly weighted-average cost database**, the Department solicits in its section D questionnaire monthly cost information for the three most significant inputs. From the information submitted for the three most significant inputs, the Department can gauge the extent to which costs for these inputs has changed. **If the cost changes appear significant in relation to COM, we will request quarterly cost information** for the five largest home and U.S. market CONNUMs to determine the actual changes in the CONNUM specific quarterly costs.

*Certain Hot-Rolled Steel Flat Products from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 53,428 (August 12, 2016) ("*Hot-Rolled Steel from Turkey*"), and accompanying Issues and Decision Memorandum, at 13-14 (emphasis added).  As stated in this passage, Commerce does not require a quarterly weighted-average cost database to consider application of the quarterly cost methodology.  Commerce first examines information on the record to determine if there were significant cost changes during the POR.  If the

17

cost changes appear significant, Commerce *then* requests the respondent to provide its quarterly weighted-average costs.

## II. Commerce deviated from its established practice

### A. Commerce failed to consider the two criteria

In the underlying proceeding, Commerce deviated from its established practice by failing to consider the two criteria for applying of the quarterly cost methodology.  The record demonstrates that those criteria are met.

#### i.   OTS's cost of manufacturing increased by more than 25%

The record demonstrates that OTS's cost of manufacturing increased by more than 25 percent during the POR.  In its administrative case brief, OTS demonstrated this point using illustrative charts and graphs.[14]  Commerce did not dispute it.[15]

In its initial Section D response, OTS indicated that steel slab is the primary raw material for the subject merchandise and represents [   ]% of OTS's COM.  Appx81257; Appx81143.  OTS also submitted its entire slab purchase data for the POR.  Appx81205-Appx81210.  Additionally, OTS provided the quarterly average purchase prices for each slab type (e.g., A36, A572, etc.).  Appx81212.  This

---

[14] *See* OTS's administrative case brief (July 6, 2022).  Appx82380-Appx82384
[15] *See* Final IDM.  Appx2335.

exhibit demonstrates that the quarterly average slab price increased by [    ]%

during the POR.  Appx82382; Appx82392.

OTS also submitted a detailed worksheet allocating its steel slab cost based

on the changing prices.  Appx81267-Appx81269.  This worksheet demonstrates

that OTS's quarterly average slab cost increased by [        ]% depending on the

slab type.  Appx82382; Appx82394.  On average, the cost of steel slab increased

by [   ]% from the lowest-COM quarter to the highest-COM quarter.  Appx82396.

OTS reported quarterly COP for every CTL-plate produced during the POR.

Based on that database, OTS's cost of manufacturing increased by [      ]% from

the low-COM quarter to the high-COM quarter depending on the CONNUM.

Appx82383; Appx82397-Appx82400.  In light of the above, the first criterion for

using the quarterly cost methodology is met.

### ii.  OTS's costs and sales prices are reasonably correlated

The record also demonstrates that OTS's costs and sales prices are

reasonably linked.  OTS demonstrated this point in its administrative case brief and

Commerce did not dispute it.[16]  As explained above, steel slab represents [   ]% of

OTS's cost of manufacturing for CTL plates.  Appx81257.  The following graphs

demonstrate the correlation between OTS's steel slab cost and its CTL price:

---

[16] *See* OTS's administrative case brief (July 6, 2022).  Appx82383-Appx82384.

OTS's Steel Slab Cost[17]               OTS's CTL Plate Price[18]
                                         (Highest Volume CONNUM)



These graphs demonstrate that OTS's costs and sales prices both increased

significantly during the POR.  They also demonstrate that the increase was most

significant in the last quarter of the POR.  Therefore, the second criterion for using

the quarterly cost methodology is also met.

**B. Commerce's failure to apply the quarterly cost methodology resulted in a serious distortion in the margin calculation**

Commerce failed to conduct a proper analysis regarding application of the

quarterly cost methodology.  As a result, Commerce unlawfully used the POR-

average costs to determine whether OTS's home market sales were made below

---

[17] Appx82394
[18] Appx82402

their cost of production.  This resulted in a serious distortion in Commerce's margin calculation.

Commerce calculates a dumping margin by comparing a respondent's U.S. prices to normal values, which are usually based on the prices of the respondent's home market sales.  In calculating the normal values, Commerce disregards home market sales that are found to be made at prices below their cost of production.  To determine the below-cost sales, Commerce normally uses the POR-average costs.  However, when the two criteria for applying the quarterly cost methodology are met, Commerce uses the quarterly costs to determine the below-cost sales.

In the underlying proceeding, Commerce unlawfully used the POR-average costs, which resulted in a serious distortion in the below-cost analysis.  OTS's costs and sales prices increased sharply in the last quarter of the POR.  However, since the POR-average costs do not reflect this change, they are higher than the actual costs in the first three quarters of the POR.  Therefore, OTS's home market sales in those quarters were found to be "below-cost" even though they were made at prices above the actual costs.  This distortive phenomenon is illustrated in the following graph:



Distortive Effective of POR-Average Costs[19]



The impact of this distortion was aggravated by Commerce's use of the 90/60 day rule.  In the context of an administrative review, the normal value is generally the weighted-average home market price in the "contemporaneous month."  To determine the contemporary month, Commerce first looks for "above-cost" home market sales in the same month in which the U.S. sale occurred.  If unsuccessful, Commerce attempts to find such sales in the most recent of the three months prior to the month of the U.S. sale (i.e., 90 days).  If still unsuccessful, Commerce searches for such sales in the earlier of the two months following the month of the U.S. sale (i.e., 60 days).  *See* 19 C.F.R. 351.414(e).  This method of

---

[19] This graph is provided for illustrative purposes only and do not represent any cost or price in the record of the underlying proceeding.

22

determining above-cost sales in the contemporaneous month is called the 90/60 day rule.

In the underlying review, all of OTS's U.S. sales were made in [

].[20]  Applying the 90/60 day rule, Commerce compared most of those U.S. sales to only two home market sales made on [                    ].[21]  All other home market sales were found to be made at prices below the POR-average costs.[22] However, during the three-month period from [                ] to [

], the price of subject merchandise increased by [      ]%.[23]  Therefore, Commerce's comparison of the sales made at the different times artificially inflated OTS's dumping margin by the same magnitude.

Commerce could reduce this distortion by using the quarterly cost methodology.  If Commerce had used the quarterly cost methodology, most of OTS's home market sales would have been found to be above-cost.  Moreover, instead of the 90/60 rule, Commerce would have selected the contemporaneous month in the same quarter in which the U.S. sales occurred.  As Defendant-Intervenor recognized in its administrative brief, quarterly price matching is "automatically invoked" where quarterly costs are merited.  Appx82436.  This

---

[20] *See* OTS's administrative case brief (July 6, 2022).  Appx82385-Appx82388.
[21] *Id.*
[22] *Id.*
[23] *Id.*

Court also sustained Commerce's departure from the 90/60 day rule where quarterly costs are used.  *See Union Steel Mfg. Co. v. United States,* 190 F. Supp. 3d 1326 (Ct. Intl. Trade 2016).

As demonstrated above, Commerce's use of the POR-average costs resulted in a serious distortion in its margin calculation.  Commerce must determine dumping margins as accurately as possible.  *See Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,* 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible.").  In the underlying review, Commerce failed to meet this obligation by failing to conduct a proper analysis regarding application of the quarterly cost methodology.

## IV. Commerce failed to provide a reasonable explanation for its deviation from the established practice

In the underlying proceeding, Commerce deviated from its established practice by failing to consider the two criteria for applying the quarterly cost methodology.  Commerce also failed to provide a reasonable explanation for the decision, making it arbitrary, capricious and otherwise not in accordance with law.

When Commerce chooses to deviate from an established practice, it must clearly explain itself so that the court may assess the reasonableness of its decision.

*See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808 (1973) (the agency has a "duty to explain its departure from prior norms."). An agency's failure to adequately explain its determination not only renders the determination unsupported by substantial evidence, it renders the decision not in accordance with law, given that an inadequately explained decision may be arbitrary. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1378, 1382-83 (Fed. Cir. 2001). For similar reasons, an agency determination grounded in evidentiary or legal sources that are inadequate to support the agency's conclusions is not in accordance with law. *Id.*

### A. OTS was not required to request application of the quarterly cost methodology

In the Final Results, Commerce ignored the record and refused to apply the quarterly cost methodology without any reasonable explanation. To support this decision, Commerce stated that "OTS did not request that Commerce consider application of the quarterly cost methodology prior to the *Preliminary Results*, nor did it submit a quarterly cost database in any response or filing." Appx2335. However, this statement was arbitrary, capricious, and unreasonable.

As explained above, Commerce established a practice for applying the quarterly cost methodology when the two criteria are met, <u>whether or not a party makes such request</u>. In *Dioctyl Terephthalate from Korea*, Commerce explicitly

stated that there is no need for a respondent to request Commerce to apply the

quarterly cost methodology:

> When the significance of cost changes and linkage between changes
> in cost and prices tests are met, the Department applies its quarterly
> cost methodology, and **there is no need for the respondent to
> request that the Department undertake such analysis**.[24]

"{I}t is well-established that 'an agency action is arbitrary when the agency

offer{s} insufficient reasons for treating similar situations differently.'" *SKF USA*

*Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

Even in the underlying proceeding, Commerce considered application of the

quarterly cost methodology without OTS's request.  In the Prelim Results,

Commerce claimed that it undertook such analysis and determined that the

quarterly cost methodology is not warranted:

> We examined NVR's and OTS's cost data. Based on our review of the
> quarterly average prices of the three largest material inputs for each
> company, we determined that our quarterly cost methodology is not
> warranted for either respondent. Therefore, we applied our standard
> methodology of using annual average costs based on NVR's and
> OTS's reported data.[25]

However, when OTS challenged this decision, Commerce faulted OTS for not

requesting "application of the quarterly cost methodology prior to the *Preliminary*

---

[24] *Dioctyl Terephthalate from Korea")*, at 8-9 (emphasis added).
[25] Appx2289.

*Results.*" Appx2335.

Furthermore, Commerce unreasonably faulted OTS for not submitting a "quarterly cost database." Commerce has previously stated that a respondent is not required to submit a quarterly cost database in order for Commerce to consider application of the quarter cost methodology:

> However, because the Department's normal methodology is to use annual average cost, in most cases the record does not contain a quarterly cost database. Consequently, to allow the Department to test for significant cost changes and **to alleviate the burden of a respondent having to report both an annual weighted-average and quarterly weighted-average cost database**, the Department solicits in its section D questionnaire monthly cost information for the three most significant inputs. From the information submitted for the three most significant inputs, the Department can gauge the extent to which costs for these inputs has changed. **If the cost changes appear significant in relation to COM, we will request quarterly cost information** for the five largest home and U.S. market CONNUMs to determine the actual changes in the CONNUM specific quarterly costs.

*Hot-Rolled Steel from Turkey,* at 13-14 (emphasis added).

Moreover, Commerce never solicited any quarterly cost database from OTS. In the underlying proceeding, Commerce failed to conduct a proper analysis regarding application of the quarterly cost methodology. As a result, Commerce failed to solicit the quarterly weighted-average cost database from OTS.

Lastly, as a factual matter, OTS submitted its quarterly COP for every CTL plate produced during the POR.  Appx81184- Appx81187.  Commerce could easily weight-average the reported quarterly COP.  In fact, the record even included an Excel pivot table that could be used to weight-average the reported quarterly COP.  Appx81178-Appx81180.  OTS even demonstrated how this could be done.  Appx82384- Appx82385; Appx82405- Appx82411.  Therefore, it was unreasonable for Commerce to assert that OTS failed to submit an <u>unsolicited</u> quarterly cost database.

### B.  OTS timely challenged Commerce's preliminary decision

In the Prelim Results, Commerce determined that the quarterly cost methodology is not warranted.  The only explanation for that decision was that it was "{b}ased on {Commerce's} review of the quarterly average prices of the three largest material inputs."  Appx2289.  However, Commerce never explained how this "review" supported the decision.  In fact, the record demonstrated the opposite.  As explained above, the record demonstrated that OTS's raw material costs increased by [    ]% during the POR.  Appx82382.

The substantial evidence standard requires the agency to provide a "rational connection between the facts found and the choice made" and "articulate a satisfactory explanation for its action."  *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971 F. Supp. 2d 1333, 1339, 1340 (Ct. Int'l Trade 2014) (quoting

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) and

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed.

Cir. 2013)).  Thus, an agency must do more than offer conclusory statements of its

findings.  *See, e.g., Shanghai Foreign Trade Enters. Co. v. United States*, 318 F.

Supp. 2d 1339, 1346 (Ct. Intl. Trade 2004) (rejecting conclusory agency

explanation as inconsistent with the substantial evidence standard).  In the

underlying proceeding, Commerce failed to provide any rational connection

between the record and its finding that the quarterly cost methodology is not

warranted.

    In its administrative brief, OTS timely challenged Commerce's preliminary

decision with illustrative charts and graphs showing the significant cost changes.

Appx82375-Appx82411.  However, even in the Final Results, Commerce never

revealed its "review" of the record that led to the decision against using the

quarterly cost methodology.  Appx2335.  Moreover, Commerce did not address

any of the factual evidence regarding the two criteria for applying the quarterly

cost methodology.  *Id.*  Instead, Commerce asserted that OTS made an untimely

"request" by raising "arguments regarding the application of the quarterly cost

methodology for the first time in its case brief."  *Id.*  This assertion contradicts

Commerce's own regulations.  Case brief is a respondent's first opportunity to

challenge Commerce's preliminary decisions.  *See* 19 C.F.R. 351.309.  Therefore,

what Commerce described as an untimely "request" to apply the quarterly cost methodology was in fact OTS's appeal to Commerce's preliminary decision on that issue. Commerce cannot reject an argument against its own decision by asserting that the argument is an untimely "request."

### C. Commerce verified the source data for OTS's quarterly costs

In the Final Results, Commerce claimed that OTS's "request" for application of the quarterly cost methodology was untimely because "at this late stage in the proceeding, any such analysis would no longer be subject to the questionnaire and verification process to test its accuracy." Appx2335. This statement is unreasonable because Commerce verified the source data for OTS's quarterly costs.

As explained above, OTS was never required to request application of the quarterly cost methodology – whether timely or untimely. What Commerce described as an untimely "request" was in fact OTS's appeal to Commerce's preliminary decision. In challenging the decision, OTS provided illustrate charts and graphs. Appx82375-Appx82411. They were based on OTS's sales data, raw material purchase data, and accounting books, all of which were available on the record throughout the proceeding. In fact, Commerce verified all of those documents in its questionnaire in lieu of verification. Appx81996-Appx82371.

OTS reported its quarterly COP for every CTL plate produced during the POR.  Appx81181-Appx81187.  Each CTL plate produced by OTS had a unique serial number.  *Id.*  For every serial number, OTS reported its quarterly COP for direct material, labor, variable overhead, and fixed overhead.  *Id.*  Commerce verified the source data for the quarterly COP. [26]   Therefore, there was no information which Commerce could not "test its accuracy" to apply the quarterly cost methodology.

### D.  The record included OTS's quarterly costs

As explained above, it is unreasonable for Commerce to assert that OTS failed to provide an <u>unsolicited</u> quarterly weighted-average cost database.  Commerce had ample time to solicit the quarterly weighted-average cost database from OTS, but failed to do so.  Moreover, the record included OTS' quarterly COP for every CTL plate produced during the POR.  Therefore, Commerce could easily weight-average the reported quarterly COP and apply the quarterly cost methodology.

In its initial questionnaire response, OTS submitted detailed information about its raw material costs, which indicated a significant cost change during the

---

[26] For example, Commerce verified OTS's reported quarterly slab prices by examining the purchase record for December 2020.  *See* OTS's In Lieu of Verification Questionnaire Response (June 13, 2022).  Appx82005.

POR. Had Commerce properly examined this record, it would have had more than six months before the Prelim Results to solicit a quarterly weighted-average cost database from OTS.

In its administrative brief, OTS provided illustrated charts and graphs demonstrating significant cost and price changes. This brief was submitted five months before the Final Results. During this time, Commerce could easily solicit the quarterly weighted-average cost database from OTS. When additional data compilations are necessary, Commerce regularly issues post-preliminary questionnaires to request additional information from respondents.[27] However, in this case, Commerce has not taken a single action during the five-month period.

Moreover, OTS submitted its quarterly COP for every CTL plate produced during the POR. Appx81181-Appx81187. Commerce could easily weight-average the reported quarterly COP. However, Commerce refused to perform the simple task of weight-averaging the data by stating that "it is not Commerce's

---

[27] *See e.g., Oil Country Tubular Goods From Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 59,054 (September 29, 2022), and accompanying Issues and Decision Memorandum (September 23, 2023), at 1 & 2 ("Following the Preliminary Determination, Commerce issued a post-preliminary determination supplemental questionnaire to Siderca, regarding certain further manufacturing issues."); *see also Prestressed Concrete Steel Wire Strand From Thailand: Final Results of Antidumping Duty Administrative Review; 2020*, 87 Fed. Reg. 48,152 (August 8, 2022), and accompanying Issues and Decision Memorandum (August 1, 2022), at 5 ("Additionally, in a post-preliminary supplemental questionnaire, we asked SIW to correct this error in the sales reconciliation worksheet, which it did in its response.")

responsibility to assemble or manipulate a respondent's reported raw data in such a way to make the case for quarterly costs." Appx2335.  Despite this claim, Commerce regularly adjusts or revises a respondent's data to improve the accuracy of its margin calculation.[28]

The record also included an Excel pivot table that could be used to weight-average OTS's reported quarterly COP.  Appx81178-Appx81180.  In its administrative brief, OTS even demonstrated how this could be done.  Appx82384-Appx82385; Appx82405- Appx82411.  However, Commerce claimed that OTS provided "insufficient explanation of how to combine the three parts of the data in this exhibit into one unified data set."[29]  Despite this claim, the data did not need to be "combined" in order for Commerce to use the pivot table.  Appx82405-Appx82411.  Therefore, Commerce could easily weight-average the reported quarterly COP.

## **CONCLUSION**

As demonstrated above, Commerce unlawfully deviated from its established practice regarding application of the quarterly cost methodology without providing

---

[28] *See e.g., Steel Concrete Reinforcing Bar From Mexico: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 75,032 (December 7, 2022), and accompanying Acerero Preliminary Analysis Memorandum (November 30, 2022) (revising the respondent's sales data using Excel pivot tables).
[29] Appx2335.  OTS submitted its quarterly cost data in three parts because of the size limit of Commerce's online platform ACCESS.

any reasonable explanation.  Therefore, for the reasons discussed in this brief, we respectfully request that the Court remand the case to Commerce for reconsideration of the quarterly cost methodology consistent with the arguments made in this brief.

Respectfully submitted,

/s/ Pierce J. Lee
Daniel J. Cannistra
Pierce J. Lee

Crowell & Moring
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 508-8780
Email: plee@crowell.com

*Counsel for Plaintiff Officine Tecnosider Srl*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 6,40 words, including text, footnotes, headings, and exhibits and excluding the table of contents, table of authorities, and counsel's signature block.

/s/ Pierce J. Lee
Pierce J. Lee