A-475-834
Remand
Slip Op. 24-102
**Public Version**
E&C/OII:  Team

*Officine Tecnosider SRL v. United States*
**Consol. Court No. 23-00001, Slip Op. 24-102 (CIT September 17, 2024)**
**Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy**

**FINAL RESULTS OF SECOND REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court

or CIT) issued in *Officine Tecnosider SRL v. United States*, Court No. 23-00001, Slip Op. 24-

1020 (CIT September 17, 2024) (*Remand Order*).  This action arises out of the final results in the

2020-2021 administrative review of the antidumping duty order on certain carbon and alloy steel

cut-to-length plate (CTL plate) from Italy covering the period of review (POR) May 1, 2020,

through April 30, 2021.[1]  On appeal, Officine Tecnosider S.R.L. (OTS) challenged Commerce's

*Final Results*, arguing that Commerce failed to explain why it declined to use OTS' quarterly

cost database.[2]  After requesting a voluntary remand and obtaining additional information

regarding OTS' reported cost of production (COP), Commerce determined that OTS satisfied

both criteria of the quarterly cost methodology.[3]  Accordingly, Commerce issued the *Remand*

*Redetermination* relying on OTS' quarterly cost database and revising OTS' weighted-average

dumping margin from 20.44 percent to 0.00 percent.[4]

---

[1] *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 87 FR 75219 (December 8, 2022) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Remand Order* at 4.
[3] *See Final Results of Redetermination Pursuant to Court Remand, Officine Tecnosider SRL v. United States*, Consol. Ct. No. 23-00001 (May 15, 2023), dated September 11, 2023 (*Remand Redetermination*), available at: https://access.trade.gov/public/FinalRemandRedetermination.aspx.
[4] *Id.* at 2 and 13; *see also Certain Carbon and Alloy Steel Cut- Length Plate from Italy:  Final Results of*

The Court subsequently remanded the *Remand Redetermination* to Commerce to explain why its test for applying a quarterly cost methodology is adequate to address a unique situation, such as here, where there is only one quarter of U.S. sales data.[5]  Although OTS experienced a significant cost change in its COP over the POR, satisfying the first part of Commerce's quarterly cost test, the Court held that Commerce failed to adequately explain the remaining criteria— whether OTS' sales prices and cost of manufacturing (COM) demonstrated a reasonable correlation between changing costs and sales prices from quarter to quarter.[6]

In light of the Court's *Remand Order*, we continue to find that the use of our quarterly cost methodology is warranted.  However, we adjusted our methodology to account for OTS' atypical dataset and expanded our linkage analysis of home market control numbers (CONNUMs) from five CONNUMs to 10.  Moreover, we have further explained the importance of examining the pricing behaviors of a respondent faced with significant cost changes and Commerce's obligation to minimize potential distortions to normal value (NV) and in turn the dumping margin.  Our analysis is consistent with Commerce's obligation to calculate dumping margins as accurately as possible and accounts for Commerce's linkage analysis in prior cases with atypical datasets.[7]  In sum, as a result of the additional five home market CONNUMs, the record now provides even more evidence that significant cost changes influenced OTS' pricing decisions, warranting Commerce to examine OTS' costs in quarterly periods.[8]

---

*Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020–2021*, 87 FR 75219, 75220 (December 8, 2022).
[5] *See Remand Order* at 28.
[6] *Id.* at 6-18.
[7] *See, e.g., Certain Welded Carbon Steel Pipe and Tube from Turkey:  Notice of Final Results of Antidumping Duty Administrative Review*, 76 FR 76939 (December 9, 2011) (*Circular Welded Pipe from Türkiye*), and accompanying IDM at Comment 8.
[8] *See* Memorandum, "Analysis Memorandum for the Draft Results of Second Redetermination," dated December 11, 2024 (Analysis Memorandum).

## II.    BACKGROUND

Commerce published the *Final Results* on December 8, 2022.[9]  As discussed in the *Final Results*, Commerce relied on OTS' annual COP data, the only COP data submitted on the record by OTS, and applied its standard methodology of using annual average costs based on the reported data.[10]

In March 2023, OTS challenged Commerce's decision to apply its standard cost methodology instead of applying the quarterly cost methodology which OTS claimed was warranted based on the information on the record.[11]  On May 8, 2023, Commerce sought a voluntary remand to reconsider whether the application of the quarterly cost methodology for OTS is appropriate, and, if appropriate, revise the dumping margin for OTS.[12]  On May 15, 2023, the Court granted Commerce's request for a voluntary remand.[13]  After reopening the administrative record to allow OTS to file additional information related to its reported COP and to allow other interested parties to submit rebuttal factual information, we found that our quarterly cost methodology was warranted for OTS and recalculated OTS' margin.[14]

In its September 17, 2024 opinion, the Court remanded the *Remand Redetermination* to Commerce to explain why its test for applying a quarterly cost methodology is adequate to address a situation where there is only one quarter of U.S. sales data.[15]  Specifically, the Court stated that, if Commerce wishes to continue applying the quarterly cost methodology, Commerce must explain:  (1) why it believes home market sales data alone allow it to render a conclusion whether sales prices are reasonably linked to the COP; (2) why it believes ignoring U.S. market

---

[9] *See Final Results*.
[10] *See Final Results* IDM at Comment 7.
[11] *See Remand Order* at 3 (citing Officine's Mot. for J. on Agency R. at 6, ECF No. 24).
[12] *Id.* at 4 (citing Motion for Voluntary Remand at 2, ECF No. 26).
[13] *See Officine Tecnosider SRL v. United States*, Court No. 23-00001 (CIT May 15, 2023).
[14] *See Remand Redetermination*.
[15] *See Remand Order* at 28.

data is or is not a departure from past practice; and (3) why the test it applies can be trusted to produce reliable results.[16]

## III.    ANALYSIS

Legal Framework

Commerce's overarching obligation is to administer the antidumping law and to calculate dumping margins as accurately as possible.[17] Section 771(35)(a) of the Tariff Act of 1930, as amended, (the Act) defines "dumping margin" as the "the amount by which the NV exceeds the export price or constructed export price of the subject merchandise." Section 773(a) of the Act reinforces this requirement and requires that Commerce determine whether the subject merchandise is being sold at less-than-fair-value by comparing the price that the subject merchandise is sold in the United States and NV. Because Commerce has an obligation to calculate accurate dumping margins and the determination of NV is central to the analysis, Commerce has an obligation to calculate NV accurately.

In market economy cases, sections 773(a)(1)(A) through (C) of the Act direct Commerce to use the price at which the foreign like product is sold in the comparison market in the ordinary course of trade as NV. Section 771(15) of the Act defines ordinary course of trade and, among other things, requires that sales that are disregarded pursuant to the sales-below-cost test set forth in section 773(b)(1) of the Act be considered outside the ordinary course of trade (*i.e.*, excluded from the pool of transactions that can serve as potential NV matches).[18] In other words, the Act requires that Commerce analyze whether sales were made below their COP before sales can be included in the pool of sales that can serve as a potential source of NV. Section 773(a)(4) of the

---

[16] *Id.* at 23-24.

[17] *See, e.g.*, *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ("{T}he basic purpose of the statute—determining current margins as accurately as possible."); *see also Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 541 (Fed. Cir. 2019); *Dongtai Peak Honey Industry Co. v. United States*, 77 F.3d 1343, 1351 (Fed. Cir. 2015); and *Timken Co. v. United States*, 354 F.3d 1334, 1343 (Fed. Cir. 2004).

[18] Pursuant to section 773(b)(1) of the Act, Commerce analyzes whether sales should be disregarded (*i.e.*, considered to have been made at less than COP) if such sales were made at less than their COP in substantial quantities within an extended period of time at prices that do not permit the recovery of all costs within a reasonable period of time.

Act directs that, in proceedings where there are no sales in the ordinary course of trade that can provide a basis for NV, Commerce shall use constructed value to determine NV.

The above discussion makes clear that, for Commerce to fulfill its obligation to calculate an accurate dumping margin, Commerce must analyze a respondent's cost of producing the merchandise under consideration (MUC). Section 773(b)(3) of the Act directs that the calculation of a respondent's COP for the purposes of the sales-below-cost test is the sum of:

> (A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;
>
> (B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and
>
> (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

Though section 773(b)(3) of the Act sets forth the component parts of a respondent's COP, the section does not dictate a specific method of calculating a respondent's costs nor prescribes a definition of the term "period."[19] Specifically, Commerce has explained that "no guidance is given with regard to whether {Commerce} should use only a single, weighted-average period of time, or multiple time periods within that production period for purposes of making comparisons and calculating a dumping margin."[20] In the vast majority of cases, Commerce uses a period of investigation/POR average cost because the use of an annualized average cost smooths out the normal cost fluctuations which occur during an accounting period

---

[19] *See Certain Pasta from Italy: Notice of Final Results of Antidumping Duty Changed Circumstances Review and Revocation, in Part*, 74 FR 41120 (August 14, 2009) (*Pasta from Italy*), and accompanying IDM at Comment 5; *see also* section 773(e) of the Act, which directs Commerce, in proceedings where there are no sales in the ordinary course of trade that can provide a basis for NV, to instead use constructed value to determine NV.

[20] *See Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 73 FR 75398 (December 11, 2008) (*SSPC from Belgium*), and accompanying IDM at Comment 4.

and, therefore, best represents a respondent's cost of producing MUC.[21]  Commerce has also explained that the use of an annual average cost is preferable because the use of shorter cost averaging periods limits potential price-to-price comparisons which is contrary to Commerce's preference.[22]

While Commerce utilizes an annualized average COP in the vast majority of cases, Commerce has long recognized that there are situations where the use of an annualized average COP would be distortive due to significant cost changes.[23]  Commerce departs from its normal average annual cost methodology when:  (a) cost changes during the review period were significant; and (b) sales during the shorter cost-averaging periods can be linked with the costs during the same averaging periods.[24]  The CIT has recognized that Commerce's linkage analysis furthers Commerce's goal of calculating accurate dumping margins because the analysis helps Commerce ascertain whether significant cost changes influence a company's pricing decisions, which, in turn, informs Commerce's determination of whether significant cost changes are relevant to Commerce's inquiry as to whether a company "engaged in underselling during the POR."[25]

In cases where record evidence indicates that a respondent experienced significant cost changes, Commerce's standard practice is to analyze the quarterly sales and COM information for the five largest sales volume CONNUMs in both the U.S. and comparison markets to determine whether significant cost changes influenced pricing decisions.[26]  Specifically, Commerce analyzes whether record evidence indicates that changes in quarterly average sales

---

[21] *Id.*; *see also Antidumping Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/Period of Review (POR) that May Require Using Shorter Cost Averaging Periods; Request for Comment*, 73 FR 26364, 26365 (May 9, 2008).
[22] *See Pasta from Italy* IDM at Comment 5.
[23] *Id.*
[24] *Id.*
[25] *See Husteel Co. v. United States*, 520 F. Supp. 3d 1296, 1311 (CIT 2021) (*Husteel*).
[26] *See, e.g.*, *Circular Welded Pipe from Türkiye* IDM at Comment 8.

prices and quarterly COM trend in the same direction more often than not (*i.e.*, finds linkage).[27]
If record evidence does not indicate that prices react to cost fluctuations during the shorter (*i.e.*,
quarterly) periods, Commerce uses its standard annualized average cost methodology because
the use of quarterly costs "would not further its goal of calculating a dumping margin that
accurately reflects a company's normal selling prices."[28]

While Commerce seeks to analyze CONNUMs with the largest sales volumes in each
market because an analysis of those CONNUMs is likely to provide the greatest insight into a
respondent's pricing practices, Commerce does not place more weight on the pricing practices in
one market over the other. Instead, Commerce focuses on whether record evidence indicates that
quarterly sales prices and quarterly COM trend in the same direction more often than not.[29]
Commerce places equal weight on the correlation between changes in sales prices and COM in
both markets because the correlation between price and COM trends in each market is equally
indicative of the extent to which the respondent's selling practices change in response to
significant cost changes.

Discussion

For purposes of these final results of redetermination, we continue to find it is appropriate
to calculate OTS' weighted-average dumping margin for the POR using OTS' quarterly COP
database and apply our quarterly cost methodology. As mentioned above, Commerce's analysis
of the largest home market CONNUMs (*i.e.*, sales of which may be used to calculate NV) gives
Commerce sufficient insight into the respondent's pricing practices to conclude that the
significant cost changes must be considered both for the purposes of conducting the sales-below-

---

[27] *Id.*

[28] *See Husteel*, 520 F. Supp. 3d at 1311.

[29] *See, e.g., Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 32720 (July 9, 2019), and accompanying IDM at Comment 18 (explaining that, after examining a comparison of the quarterly COM and quarterly weighted-average sales prices for the five most frequently sold CONNUMs in the home market and the five most frequently sold CONNUMs in the U.S. market, linkage existed because sales and costs "generally trended in the same direction for the majority of the products analyzed.").

cost test pursuant to section 773(b)(1) of the Act and ultimately the calculation of NV pursuant to section 773(a) of the Act.  Specifically, as shown in the Analysis Memorandum, the top five CONNUMs by sales quantity in the home market constitute [   ] percent of OTS' home market sales.[30]  Additionally, the analysis of the quarterly price-cost movements submitted in the previous remand redetermination demonstrates linkage during [   ] of [   ] quarterly segments analyzed, which indicates that the significant cost changes influence OTS' pricing decisions such that departing from Commerce's use of an annualized average COM and applying our quarterly cost methodology results in a more accurate calculation of NV.[31]

As explained above, Commerce's finding of linkage for the home market sales that constituted [   ] percent of the total home market sales demonstrates that the significant cost changes are relevant to Commerce's ultimate calculation of an accurate dumping margin.  While Commerce normally presumes that the analysis of the top five CONNUMs in each market is needed to gain insight into whether significant cost changes should be considered when calculating NV,[32] there have been other proceedings in which Commerce analyzed whether significant cost changes should be reflected in the calculation of NV even though one (or both) markets had atypical data points.  For example, in the *Circular Welded Pipe from Türkiye* administrative review, Commerce was unable to analyze linkage in the U.S. market due to data limitations and, therefore, expanded its linkage analysis of home market CONNUMs from five CONNUMs to ten CONNUMs before determining that it was appropriate to utilize its quarterly cost methodology.[33]  Similarly, in another administrative review, *Welded Line Pipe from Korea*, because there was no viable comparison market, Commerce based its significance and linkage

---

[30] *See* Analysis Memorandum at Attachment I.

[31] *Id.* at Attachment II.

[32] *See, e.g.*, *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 FR 24387 (April 20, 2023) (*Hot-Rolled Steel from Korea*), and accompanying IDM at Comment 1 (reiterating Commerce's approach of examining the top five CONNUMs in each market), unchanged in *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Amended Final Results of Antidumping Duty Administrative Review in Part; 2020-2021*, 88 FR 29635 (May 8, 2023).

[33] *See Circular Welded Pipe from Türkiye* IDM at Comment 8.

analysis on ten U.S. CONNUMs.[34]  Though Commerce determined that linkage did not exist in *Welded Line Pipe from Korea*, Commerce's decision to expand its analysis from five CONNUMs in the preliminary results to ten CONNUMs in the final results demonstrates Commerce's recognition of the need to ensure that NV is calculated accurately.[35]  These cases demonstrate that, where the data, based on the top five CONNUMS in each market, do not permit a fulsome analysis of the CONNUMs in both markets, Commerce has a practice of expanding the number of CONNUMs examined in one market to assess whether it is appropriate to depart from its use of an annualized average cost for use in the determination of NV.

In the *Ferrovanadium from Korea* investigation, it appears from an analysis of the issues and decision memorandum in that case that Commerce followed its practice and determined that the sole CONNUM it examined in that case afforded ample insight into the relationship between significant cost changes and the respondent's pricing practices.[36]  The respondent only produced three CONNUMS and sold only one of those CONNUMS in the U.S. market.  The issues and decision memorandum in *Ferrovanadium from Korea* simply states that Commerce focused on the only CONNUM sold in the U.S. market, which was also the highest sales volume CONNUM sold in the home market.[37]  The issues and decision memorandum, however, does not discuss why Commerce did not perform a linkage analysis of the remaining two CONNUMs or what compelled Commerce to select that CONNUM for examination.  Thus, we cannot, without examining the record of that proceeding, comment on whether there were unique facts in that review that would explain why the analysis was limited to a single CONNUM, *e.g.*, the remaining two CONNUMs lacked sufficient data points, were sold in negligible quantities, were

---

[34] *See Welded Line Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 27762 (June 6, 2019) (*Welded Line Pipe from Korea*), and accompanying IDM at Comment 12.
[35] *Id.*
[36] *See Ferrovanadium from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 82 FR 14874 (March 23, 2017) (*Ferrovanadium from Korea*), and accompanying IDM at Comment 8.
[37] *Id.*

products produced by another manufacturer that could not serve as a basis for NV, or were non-prime products.  The record of that proceeding is not on the record of this proceeding; therefore, Commerce is unable to reach any further conclusions with respect to *Ferrovanadium from Korea* on remand.

As mentioned above, Commerce's analysis of OTS' top five CONNUMs with the largest sales volume in the current proceeding covered [   ] percent of OTS' home market sales and, therefore, gave Commerce sufficient insight into whether significant cost changes were relevant to the calculation of NV.  However, for this redetermination, we expanded our analysis to include the next five largest CONNUMs by sales quantity in the home market, as we did in *Circular Welded Pipe from Türkiye*.  Including these additional CONNUMs results in an analysis of approximately [   ] percent of OTS' home market sales.[38]  As can be seen in Attachment 1, our analysis of OTS' top five CONNUMs by sales quantity in the home market shows correlation for [   ] out of [   ] quarters, and our analysis of the top 10 CONNUMs by sales quantity shows correlation for [   ] out of [   ] quarters.[39]  Both of these metrics demonstrate that the significant cost changes affected OTS' pricing decisions such that the use of quarterly cost averaging periods contributes to a more accurate calculation of NV.

Pursuant to its normal practice, Commerce would have analyzed the correlation between quarterly sales prices and quarterly COM amounts for the top five CONNUMs sold by OTS in the United States if the data had permitted it to do so.  Finally, because sections 771(15), 773(a), and 773(b) of the Act require that Commerce conduct the sales below cost test to determine the pool of potential sources of NV and, as a result, obligate Commerce to determine whether it is appropriate to rely on an annual average cost or shorter quarterly cost averaging periods prior to conducting the sales below cost test, Commerce would violate the statutory scheme if it were to

---

[38] *See* Analysis Memorandum at Attachment I.
[39] *Id.* at Attachment II.

revisit its decision as to whether significant cost changes affected a respondent's pricing behavior after determining which sales actually served as the basis for NV.[40]  Similarly, it is not appropriate for the petitioner to have previously focused its analysis on the CONNUMs that actually served as the basis for NV.

Nevertheless, to further illustrate the utility of examining the correlation of quarterly sales price and quarterly cost changes for those CONNUMs with the largest sales quantities as a way to assess whether significant cost changes are relevant to Commerce's obligation to calculate NV accurately, Commerce has analyzed the correlation between the significant cost changes and prices for the [        ] CONNUMs that actually served as the basis for NV. Commerce notes that [      ] of the CONNUMs [                ] the top 10 home market sales by quantity and that the remaining CONNUM was among the [                              ] previous analysis.[41]  Our analysis of these [      ] CONNUMs reveals that there was a correlation between significant cost changes and prices for [      ] of the [      ] quarters, which indicates that the significant cost changes affected the pricing decisions for these [        ] CONNUMs.[42]

Indeed, Commerce's focus is on determining whether significant cost changes affect pricing decisions to the extent that a departure from Commerce's practice of relying on an annualized weighted average cost results in the calculation of a more accurate NV that, in turn, results in a more accurate dumping margin.  In its voluntary remand, with respect to home market sales, Commerce determined pursuant to its normal practice that there was a correlation between quarterly sales prices and quarterly COM amounts for the top five CONNUMs sold in OTS' home market.[43]  However, in the same remand, Commerce also found that all of OTS'

---

[40] *See, e.g.*, *Hot-Rolled Steel from Korea* IDM at Comment 1 (explaining that "{i}t is not possible to discern which sales are below cost until we know which costs (annual or quarterly) we would use for the sales below cost test pursuant to section 773(b) of the Act" and that expanding the number of CONNUMs analyzed then weighting all CONNUMs equally without regard to sales quantities is unreliable and potentially distortive).
[41] *See* Analysis Memorandum at Attachments I and II.
[42] *Id.* at Attachment II.
[43] *See Remand Redetermination* at 12.

U.S. sales during the POR occurred in the same quarter; therefore, Commerce could not perform its linkage analysis for the U.S. sales because its analysis requires consideration of sales in multiples quarters to determine if a correlation exists.[44]  In other words, the U.S. data could not allow for Commerce to make a correlation analysis.

In its holding, the Court agreed with Commerce that the agency could not complete its trend analysis for U.S. sales when there was only one quarter of sales under consideration on the record.[45]  Under its normal practice, Commerce would have analyzed the correlation between quarterly sales prices and quarterly COM amounts for the top five CONNUMs sold in the United States during the POR if the data had permitted it to do so; however, as we have stated, they did not.

Thus, as explained above, Commerce has determined to use an alternative methodology and consider additional data points on the record for its linkage analysis, and that analysis reasonably provides insight into the company's cost and pricing practices as a whole, regardless of market.  Commerce's analysis of the top five CONNUMs in the home market covered approximately [    ] percent of home market sales during the POR, and including the next five additional CONNUMs results in an analysis of approximately [    ] percent of home market sales.[46]  Accordingly, Commerce determines that the use of shorter cost-averaging periods results in a more accurate calculation of NV for OTS and, in turn, a more accurate dumping margin.

## IV.    INTERESTED PARTY COMMENTS

On December 11, 2024, Commerce released the draft results of redetermination to all interested parties and invited parties to comment.[47]  On December 17, 2024, we received

---

[44] *Id.*
[45] *See Remand Order* at 16.
[46] *See* Analysis Memorandum at Attachment I.
[47] *See* Draft Results of Second Redetermination Pursuant to Court Remand, *Officine Tecnosider SRL v. United States*, Consol. Court No. 23-00001 Slip Op. 24-102 (CIT September 17, 2024), dated December 11, 2024 (Draft Results of Second Redetermination).

comments from Nucor Corporation (Nucor).[48]  We address these comments below, and, after consideration of these comments, we made no changes to our conclusions in the Draft Results of Second Redetermination for these final results of second redetermination.

**Comment 1:  Whether the Record Demonstrates that OTS Qualifies for the Quarterly Cost Methodology**

*Nucor's Comments*:

Nucor did not provide the requested executive summary for its comments on the Draft Results of Second Redetermination.  Its arguments may be found at pages 2 through 7 of Nucor's Comments.

**Commerce's Position:**

For the final results of second redetermination, we continue to rely on OTS' quarterly COP data for the margin calculations.  As discussed above, when analyzing whether a respondent's significant cost changes influenced the company's pricing decisions, Commerce focuses on whether record evidence indicates that changes in quarterly average sales prices and quarterly COM trend in the same direction more often than not.  While OTS' U.S. sales data do not indicate whether or not OTS' changes in quarterly prices generally correlated with its quarterly changes in costs during the POR, our analysis of OTS' home market sales of the largest CONNUMs by volume provides evidence of such a correlation, *i.e.*, linkage, during the POR such that the record evidence supports the application of our quarterly cost methodology. Accordingly, Commerce continues to determine that the use of shorter cost-averaging periods results in a more accurate calculation of NV for OTS and, in turn, a more accurate dumping margin.

---

[48] *See* Nucor's Letter, "Comments on Draft Results of Second Redetermination," dated December 17, 2024 (Nucor's Comments).  OTS filed a letter in lieu of comments, stating that OTS agrees with the Draft Results of Second Redetermination and believes that the additional analysis and explanations provided by Commerce fully meet the requirements and instructions set forth by the Court in the *Remand Order*.  *See* OTS' Letter, "Letter in Lieu of Comments on Draft Results of Second Redetermination," dated December 17, 2024.

In its comments, Nucor argues that Commerce should revise its determination and apply the normal, annual weighted-average cost methodology to OTS because the record fails to demonstrate that OTS qualifies for the quarterly cost methodology.[49]  Nucor claims that Commerce's analysis is flawed and fails to address the concerns raised by the Court because, according to Nucor, we failed to explain why it is appropriate to "ignore" the U.S. market in our linkage analysis.[50]  Nucor further claims that our explanation in the second redetermination contradicts our past practice.[51]  We disagree for the reasons discussed below.

To determine whether the application of the quarterly costs methodology is appropriate, Commerce must find that the respondent's data meets two criteria: (a) the change in the cost of manufacturing during the period of review was significant; and (b) the record evidence indicates that sales made during the shorter cost-averaging periods could be reasonably linked with the costs during the same shorter cost-averaging periods.[52]  Commerce is "afforded considerable discretion in formulating its practices" in calculating costs of production and determining the relevant time periods for such calculations.[53]  Here, it remains uncontested that the record demonstrates that OTS experienced significant cost changes.[54]  Because these cost changes were significant, Commerce examined whether there was evidence of a linkage between the cost changes and sales prices during the relevant period and concluded that there was a reasonable correlation between them sufficient to show a quarterly trend.[55]

As Nucor correctly notes, we are unable to perform our linkage analysis for OTS' U.S. sales during the POR because these sales all occurred in the same quarter, and our linkage

---

[49] *See* Nucor's Comments at 1-2.
[50] *Id.* at 6.
[51] *Id.* at 3-7.
[52] *See Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1235-36 (CIT 2011).
[53] *Id.*
[54] *See* OTS' Letter, "Remand Redetermination in the 2020-2021 Antidumping Duty Administrative Review of Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy," dated May 30, 2023, at 2 and Exhibit RD-2.
[55] *See SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1363 (CIT 2010) (recognizing that "{t}he statute 'does not dictate the method by which Commerce may calculate costs of production, nor ... define the term "period,"' and Commerce is afforded considerable discretion in formulating its practices in this regard.").

analysis requires consideration of sales in multiples quarters to determine if a correlation exists

between a respondent's quarterly changes in costs and sales prices.[56]  As noted above, in its

holding, the Court agreed that Commerce could not complete its trend analysis for U.S. sales

when there was only one quarter of sales under consideration on the record.  However, Nucor

mistakenly concludes that because Commerce  was unable to conduct any analysis with regard to

U.S. sales, it disregarded the need for the U.S. dataset all together.[57]

     We disagree that we were unable to conduct any analysis of OTS' POR U.S. sales or that

we ignored or lacked this data set.  To the contrary, OTS provided its POR U.S. sales data on the

record of this proceeding, and, as Nucor concedes, we examined these data and found that,

because all OTS' POR U.S. sales were in the same quarter, such sales data could not indicate or

provide evidence whether OTS' quarterly changes in costs generally correlated with quarterly

changes in sales prices during the POR.[58]  Thus, we did examine and analyze OTS' U.S. sales

data but found that the data did not and could not indicate whether linkage existed between OTS'

costs and sales prices during the POR.  We further found that, because OTS' U.S. sales data were

inconclusive, the only sales price data on the record that could provide evidence whether OTS'

quarterly costs were reasonably correlated with its quarterly sales prices during the POR, and, in

turn, whether application of annual or shorter cost-averaging periods would result in a more

accurate calculation of NV, are OTS' quarterly home market prices.  Accordingly, we applied an

alternative linkage analysis, as we have in previous cases.

     Nucor claims our assertion that we place equal weight on the correlation between

quarterly costs and prices in both markets is contradicted by our normal practice because we

usually consider trends in both markets and only find linkage if a majority of comparisons in

---

[56] *See* Nucor's Comments at 3 (citing Draft Results of Second Redetermination at 12).
[57] *Id.* at 4.
[58] *See* Draft Results of Second Redetermination at 12.

both markets support such a finding.[59]  As we explain above, we agree that we would normally consider quarterly trends in both markets, and we would do so here if the data permitted such comparisons; however, the record of this review only provides us with conclusive information about quarterly trends in the home market, and, thus, we are unable to follow our usual practice to determine whether linkage exists.

We also agree that we only find linkage if a majority of comparisons support such a finding, which, as we explained above, is the case for OTS, but we disagree with Nucor that we will **only** make such a finding if we can make such comparisons in both markets.  Nucor cites to *Circular Welded Pipe from Türkiye* in support of this claim; however, Nucor misreads the decision to which it cites.  In that proceeding, we explained that we only find linkage if a majority of comparisons support such a finding; however, as in this redetermination, we examined the top ten highest sales volume CONNUMs in the home market alone and found evidence of linkage because we determined that the U.S. sales information did not allow us to analyze whether quarterly changes in costs and prices were reasonably correlated.[60]  In other words, we did not state that we had to make comparisons in both the home and U.S. markets or find that a majority of comparisons supported a finding of linkage in both markets, only that the majority of comparisons in total supported such a finding.

Nucor proposes a hypothetical situation where there is evidence of linkage in one market and evidence of no linkage in the other, *i.e.*, affirmative record evidence demonstrating that, for a majority of the comparisons, linkage did not exist during the POR.  However, we do not find this proposal persuasive because it is not the situation on the record of our review.[61]  Unlike Nucor's hypothetical, in our review, OTS' U.S. pricing information does not and cannot provide any

---

[59] *See* Nucor's Comments at 4 (citing *Circular Welded Pipe from Türkiye* IDM at Comment 8 at 22 n.14).
[60] *See Circular Welded Pipe from Türkiye* IDM at Comment 8 at n.14.
[61] *See Asociacion Colombiana de Exportadores de Flores v. United States*, 704 F. Supp. 1114, 1117 (CIT 1989), *aff'd* 901 F.2d 1089 (Fed. Cir.1990) ("Speculation is not support for a finding....").

evidence regarding whether linkage existed for OTS during the POR, while the home market

information allows such comparisons and provides affirmative evidence that OTS' quarterly

costs and prices were reasonably correlated during the POR.  On the basis of this affirmative

evidence, we find that linkage did exist for OTS during the POR and the use of shorter cost

average periods is more appropriate and results in a more accurate calculation of OTS' dumping

margin.

We also disagree that our approach here is inconsistent with our past practice.  Nucor

argues that *Circular Welded Pipe from Türkiye* is distinguishable because, in *Circular Welded

Pipe from Türkiye*, Commerce "examined and considered the relationship between sales and

costs in the U.S. market, but found that, because it did not have at least three quarters of

comparisons for any of the relevant CONNUMs, the data were inconclusive."[62]  According to

Nucor, in that review, Commerce considered the information regarding U.S. sales, but, in our

redetermination, we instead found that there was no usable data regarding U.S. sales and

concluded that this fact was immaterial.  We disagree, and we find that our approach in this

redetermination is directly analogous:  we examined and considered OTS' U.S. sales data; found

that we are unable to draw any conclusions from that data because we do not have any quarters

of comparisons in the U.S., let alone three quarters for any CONNUM; and, because we could

not follow our normal practice, we examined OTS' top ten highest sales volume CONNUMs in

the home market alone to determine whether the record evidence demonstrated linkage between

OTS' quarterly costs and sales prices.[63]

In a footnote, Nucor implies that that we improperly relied on *Circular Welded Pipe from

Türkiye* because the decision did not clearly state why we limited our CONNUM analysis in that

review.[64]  However, unlike *Ferrovanadium from Korea*, in *Circular Welded Pipe from Türkiye*,

---

[62] *See* Nucor's Comments at 5-6 (citing *Circular Welded Pipe from Türkiye* IDM at Comment 8 n.14).
[63] *See Circular Welded Pipe from Türkiye* IDM at Comment 8 and n.14.
[64] *See* Nucor's Comments at 6 n.23.

we explicitly explained why we departed from our standard practice and analyzed the ten most

frequently sold home market CONNUMs:

> We normally analyze the largest five most frequently sold CONNUMs sold in the home market and the largest five most frequently sold CONNUMs sold in the U.S. However, we noted that none of the CONNUMs sold in the U.S. had sales and costs reported for the same quarters for at least three quarters of the POR. Without comparable sales prices and costs for at least three quarters, comparison of quarterly prices and cost trends for the linkage analysis proves to be inconclusive. We have therefore used the top ten highest sales volume CONNUMs sold in the home market in our quarterly cost analysis.[65]

Thus, unlike in *Ferrovanadium from Korea*, we clearly explained in *Circular Welded Pipe from Türkiye* that, because the respondent's U.S. sales data did not permit an analysis whether linkage existed during the POR, we applied an alternative linkage analysis based on costs and sales in the home market. Here, we again find that the U.S. sales data do not permit an analysis whether linkage existed during the POR, and we again find it is appropriate to apply an alternative linkage analysis based on costs and sales in the home market.

Nucor also seems to imply that the number of home market CONNUMs that are compared to U.S. sales is somehow relevant to our analysis; however, it does not cite to any precedent to support such an assertion.[66] Indeed, as we stated above, Commerce departs from its normal average annual cost methodology when: (a) cost changes during the review period were significant; and (b) sales during the shorter cost-averaging periods can be linked with the costs during the same averaging periods.[67] In cases where record evidence indicates that a respondent experienced significant cost changes, Commerce analyzes whether record evidence indicates that

---

[65] *See Circular Welded Pipe from Türkiye* IDM at Comment 8 n.14 (internal citations omitted) (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Preliminary Results of the Antidumping Duty Administrative Review*, 75 FR 77838, 77844 (December 14, 2010); *Certain Pasta from Italy: Notice of Final Results of the Thirteenth Antidumping Duty Administrative Review*, 75 FR 81212 (December 27, 2010), and accompanying IDM at Comment 1; *Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of Antidumping Duty Administrative Review*, 75 FR 6627 (February 10, 2010), and accompanying IDM at Comment 6; and *SSPC from Belgium* IDM at Comment 4).

[66] *See* Nucor's Comments at 6-7.

[67] *See Pasta from Italy* IDM at Comment 5.

changes in quarterly average sales prices and quarterly COM trend in the same direction more often than not (*i.e.*, finds linkage).[68]  Thus, our analysis of whether quarterly costs are appropriate do not involve examining the number of home market CONNUMs that match to U.S. sales.

In another footnote, Nucor states that we misunderstood its argument, and it was not suggesting that Commerce revisit its determination as to whether significant cost changes affected a respondent's pricing behavior after determining which sales served the basis for NV. Rather, according to Nucor, it had noted that the home market CONNUMs that would be used as comparisons if Commerce chose a particular cost methodology may be particularly relevant in determining whether that methodology is appropriate.[69]  We fail to see the difference.  If we were to look at which CONNUMs were to be used as comparisons in one cost methodology versus another to determine which methodology is appropriate, we would still be revisiting our determination whether significant cost changes affected a respondent's pricing behavior after determining the basis for NV because we would be reconsidering whether quarterly costs were appropriate.[70]  Moreover, if Commerce were to consider which home market CONNUMs would be used as comparisons if Commerce chose a particular cost methodology over another, this approach would still result in Commerce determining whether it is appropriate to rely on an annual average cost or shorter quarterly cost averaging periods after conducting the sales below cost test, in violation of sections 771(15), 773(a), and 773(b) of the Act.

Finally, we do not think it is appropriate to ignore the affirmative record evidence that OTS' quarterly changes in costs were linked to its quarterly changes in sales prices during the POR merely because the OTS' U.S. sales data are inconclusive as to linkage.  Nucor's argument

---

[68] *See, e.g.*, *Circular Welded Pipe from Türkiye* IDM at Comment 8.
[69] *See* Nucor's Comments at 7 n.27.
[70] *See Husteel*, 520 F. Supp. 3d at 1311 (Commerce's linkage analysis furthers Commerce's goal of calculating accurate dumping margins because the analysis helps Commerce ascertain whether significant cost changes influence a company's pricing decisions.).

seems to be that, because OTS' U.S. sales data do not permit quarterly comparisons, we cannot find that linkage exists, and we should default to using OTS' annual costs. However, this argument ignores that Commerce's analysis of the top five CONNUMs in the home market covers approximately [  ] percent of home market sales during the POR, and including the next five additional CONNUMs results in an analysis of approximately [  ] percent of home market sales.[71] As previously stated, while Commerce seeks to analyze CONNUMs with the largest sales volumes in each market because an analysis of those CONNUMs is likely to provide the greatest insight into a respondent's pricing practices, Commerce does not place more weight on the pricing practices in one market over the other. To find that we cannot determine whether a respondent's significant cost changes affected its pricing behavior simply because its U.S. sales data do not permit quarterly comparisons would be speculative and place all weight on a respondent's pricing practices in the U.S. market.[72] Furthermore, in this review, such an approach would require us to ignore the affirmative record evidence that OTS' quarterly sales prices and quarterly COM trended in the same direction more often than not during the POR. Based on this affirmative evidence, as well as the significant volume of sales we examined, we continue to find that our linkage analysis based on OTS' quarterly costs and sales prices in the home market is a sufficiently reliable indicator of linkage for OTS during the POR with respect to its overall selling practices, including those in the U.S. market.

Thus, Commerce continues to determine that the use of shorter cost-averaging periods results in a more accurate calculation of NV for OTS and, in turn, a more accurate dumping margin, and we accordingly continue to find it is appropriate to apply our quarterly cost methodology in our calculation of OTS' dumping margin for the POR.

---

[71] *See* Analysis Memorandum at Attachment I. We also note that the analyses cover approximately [  ] percent and [  ] percent, respectively, of OTS' combined U.S. and home market sales during the POR. *Id.*
[72] *See Mid Continent Nail Corp. v. United States*, 949 F. Supp. 2d 1247, 1281 (CIT 2013) ("Speculation and surmise are no substitute for affirmative evidence.")

## V.    FINAL RESULTS OF SECOND REDETERMINATION

As stated above, we continue to find it is appropriate to calculate OTS' estimated weighted-average dumping margin for the POR using its quarterly COP database and applying our quarterly cost methodology.  As a result, the estimated weighted-average dumping margin for OTS remains 0.00 percent.

Because the weighted-average dumping margin for OTS is different from the dumping margin in the *Final Results*, should the Court sustain these final results of redetermination, Commerce intends to publish a notice of court decision not in harmony with the results of administrative review and notice of amended final results and issue instructions to U.S. Customs and Border Protection to liquidate appropriate entries during the POR of subject merchandise from OTS.  Because OTS has a superseding cash deposit rate from a subsequent administrative review of the antidumping duty order on CTL plate from Italy, we do not intend to issue an amended cash deposit instruction.

1/15/2025

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance