**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| OFFICINE TECNOSIDER SRL, | ) |
| | ) |
| *Plaintiff*, | ) |
| v. | )    Court No. 23-00001 |
| | ) |
| THE UNITED STATES, | )    **Redacted Public Version** |
| | ) |
| *Defendant*, | ) |
| | ) |
| and | ) |
| | ) |
| NUCOR CORPORATION, | ) |
| | ) |
| *Defendant-Intervenor*. | ) |

---

**DEFENDANT'S RESPONSE TO**
**COMMENTS ON THE SECOND REMAND REDETERMINATION**

---

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:                          AUGUSTUS J. GOLDEN
ASHLANDE GELIN                       Trial Attorney
Attorney                             U.S. Department of Justice
Office of the Chief Counsel          Civil Division
    for Trade Enforcement and Compliance    Commercial Litigation Branch
U.S. Department of Commerce          P.O. Box 480
Washington, D.C.                     Ben Franklin Station
                                     Washington, D.C. 20044
                                     Tel: (202) 305-5915
                                     Fax: (202) 307-0972
                                     Email: augustus.j.golden@usdoj.gov

March 17, 2025                       Attorneys for Defendant

## TABLE OF CONTENTS

BACKGROUND ....................................................................................................... 2

    I.    Commerce's Final Results And Voluntary Remand ................................. 2

    II.    Commerce's First Remand Redetermination ......................................... 2

    III.    The Court's Second Remand Order ...................................................... 3

    IV.    Commerce's Second Remand Redetermination .................................... 4

ARGUMENT ......................................................................................................... 6

    I.    Standard Of Review ............................................................................. 6

    II.    Legal Framework for Quarterly Cost Methodology ............................. 7

    III.    Commerce's Second Remand Redetermination Should Be Sustained ................... 8

    IV.    Contrary to Nucor's Arguments, Commerce Addressed the Court's Remand Order .................................................................................... 12

CONCLUSION.................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ................................................................................7, 13

*Consol. Int'l Automotive v. United States*,
   809 F. Supp. 125 (Ct. Int'l Trade 1992)...............................................13

*Husteel Co. v. United States*,
   520 F. Supp. 3d 1296 (Ct. Int'l Trade 2021).........................................8

*Intell. Ventures I LLC v. Motorola Mobility LLC*,
   870 F.3d 1320 (Fed. Cir. 2017) ...........................................................17

*MacLean-Fogg Co. v. United States*,
   100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................6

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ...........................................................14

*Officine Tecnosider SRL v. United States*,
   Court No. 23-00001, Slip Op. 24-102 (Ct. Int'l Trade Sept. 17, 2024) ....................................1

*OSI Pharms., LLC v. Apotex Inc.*,
   939 F.3d 1375 (Fed. Cir. 2019) ...........................................................17

*Pastificio Garofalo, S.P.A. v. United States*,
   469 F. App'x 901 (Fed. Cir. 2012), ......................................................7

*Pastificio Lucio Garofalo, S.p.A. v. United States*,
   783 F. Supp. 2d 1230 (Ct. Int'l Trade 2011), *aff'd sub nom. Pastificio Garofalo, S.P.A. v.*
   *United States*, 469 F. App'x 901 (Fed. Cir. 2012) ...........................7, 8

*Rebar Trade Action Coalition v. United States*,
   503 F. Supp. 3d 1295 (Ct. Int'l Trade 2021)....................................8, 14

*Vandewater Int'l Inc. v. United States*,
   589 F. Supp. 3d 1324 (Ct. Int'l Trade 2022) .......................................13

**Statutes**

19 U.S.C. § 1516a(b)............................................................................................7

19 U.S.C. § 1677...............................................................................................7

19 U.S.C. § 1677b.............................................................................................7

**Administrative Determinations**

*Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy*,
 87 Fed. Reg. 75,219 (Dep't of Commerce Dec. 8, 2022).........................................1

*Certain Pasta From Italy*,
 78 Fed. Reg. 9,364 (Dep't Commerce Feb. 8, 2013) .............................................16

*Certain Pasta From Italy: Notice of Final Results of Antidumping Duty Changed Circumstances Review and Revocation, in Part*,
 74 Fed. Reg. 41,120 (Dep't of Commerce Aug. 14, 2009)........................................13

*Certain Welded Carbon Steel Pipe and Tube from Turkey: Notice of Final Results of Antidumping Duty Administrative Review*,
 76 Fed. Reg. 76,939 (Dep't of Commerce Dec. 9, 2011)...................................*passim*

*Ferrovanadium from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*,
 82 Fed. Reg. 14874 (Dep't of Commerce March 23, 2017)......................................10

*Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*,
 84 Fed. Reg. 27,762 (Dep't of Commerce June 6, 2019).....................................*passim*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| OFFICINE TECNOSIDER SRL, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Court No. 23-00001 |
| | ) | |
| THE UNITED STATES, | ) | **<u>Confidential Version</u>** |
| | ) | |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NUCOR CORPORATION, | ) | |
| | ) | |
| *Defendant-Intervenor.* | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO**
**<u>COMMENTS ON THE SECOND REMAND REDETERMINATION</u>**

 Defendant, the United States, respectfully submits this response to comments filed by Defendant-Intervenor Nucor Corporation (Nucor), ECF Nos. 58-60 (Nucor's Cmts.) concerning the Department of Commerce's second remand redetermination filed in accordance with this Court's decision and remand order in *Officine Tecnosider SRL v. United States*, Court No. 23-00001, Slip Op. 24-102 (Ct. Int'l Trade Sept. 17, 2024) (*Remand Order*). *See* Final Results of Redetermination Pursuant to Court Remand, Jan. 15, 2025 (Second Remand Redetermination), ECF Nos. 53-54. For the reasons explained below, we respectfully request that the Court sustain Commerce's second remand redetermination and enter final judgment for the United States.

## BACKGROUND

### I.    Commerce's Final Results And Voluntary Remand

On December 8, 2022, Commerce published its final results in the 2020-2021 administrative review of the antidumping duty order covering certain carbon and alloy steel cut-to-length plate from Italy.  *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy*, 87 Fed. Reg. 75,219 (Dep't of Commerce Dec. 8, 2022) (Final Results), and accompanying Issues and Decision Memorandum (IDM).  In the final results, Commerce relied on its standard methodology of using annual average costs to calculate mandatory respondent Officine Tecnosider Srl (OTS)'s cost of production.  *Id.*

OTS subsequently filed suit and challenged Commerce's decision to apply its standard cost methodology.  OTS asserted that Commerce should have instead applied a quarterly cost methodology.  *See* Officine's Mot. for J. on Agency R. at 6, ECF No. 24.  Specifically, OTS alleged that Commerce failed to analyze the issue of quarterly costs with respect to OTS's data, and that Commerce failed to disclose its analysis on such data.  *Id.*

On May 8, 2023, Commerce requested a voluntary remand to reconsider whether the application of the quarterly cost methodology for OTS is warranted, and, if appropriate, to revise the dumping margin for OTS.  Motion for Voluntary Remand at 2, ECF No. 26.  On May 15, 2023, the Court granted Commerce's request for a voluntary remand.  ECF No. 29.

### II.    Commerce's First Remand Redetermination

On remand, Commerce reopened the administrative record to: (1) request that OTS file additional information for its reported cost of production; and (2) allow other interested parties to submit factual information to rebut, clarify, or correct this information.  *See* Remand Supp. Questionnaire, Appx3000–Appx3002.  On May 30, 2023, OTS filed its response to Commerce's

request for information.  *See* Supp. Resp., Appx3003–Appx3021, Appx83000–Appx83018.

Based on OTS's reported information, Commerce preliminarily determined to depart from using

its standard cost methodology and recalculated OTS's estimated weighted-average dumping

margin by relying on its quarterly cost database.  *See* Draft Remand, Appx3022–Appx3028;

Draft Calc. Memo Appx3029–Appx3035, Appx83019–Appx83383.  Commerce relied on

quarterly costs because record evidence demonstrated that OTS experienced significant cost

changes over the period of review and that changes in sales prices reasonably correlated to

changes in cost.  *Id*.

On September 12, 2023, after providing parties the opportunity to commend on the draft

remand results, *see* Nucor's Comments on Draft Remand, Appx3036–Appx3047, Appx83384–

Appx83395, Commerce filed its first remand redetermination, in which it continued to use its

quarterly cost methodology and calculated a revised dumping margin of 0.00 percent for OTS.

*See* Remand Redetermination, Appx3048–Appx3060; Remand Calc. Memo, Appx3061–

Appx3062, Appx83396–Appx83397.

## III.    The Court's Second Remand Order

On September 17, 2024, the Court remanded Commerce's decision to depart from its

normal practice of using an annual weighted-average cost methodology and instead use a

quarterly cost methodology to analyze sales during the period of review for further explanation.

*See* Remand Order at 27.  The Court found there was no dispute regarding Commerce's

determination that OTS experienced a significant cost change in its cost of production over the

period of review.  *See id*. at 11.  However, the Court held that Commerce failed to a

dequately explain the remaining criteria of its quarterly cost analysis — whether OTS's

sales prices and cost demonstrated a reasonable correlation between changing costs and sales

prices from quarter to quarter (*i.e.*, linkage). *Id.* at 17-28.

Considering that Commerce's linkage analysis generally evaluates both home market and U.S. sales data from quarter to quarter, and OTS had only U.S. sales during one quarter of the period of review, the Court held that Commerce's remand redetermination failed to address why its "normal" linkage test was adequate to address OTS's atypical dataset. *Id.* at 27.  The Court explained that "if Commerce wishes to continue to apply its quarterly cost methodology, it must explain: (1) why it believes home market sales data alone allow it to render a conclusion whether sales prices are reasonably linked to the cost of production; (2) why it believes ignoring U.S. market data is or is not a departure from past practice; and (3) why the test it applies can be trusted to produce reliable results." *Id.* at 23-24.

## IV.   **Commerce's Second Remand Redetermination**

On remand, Commerce continued to find that the use of its quarterly cost methodology is warranted for OTS's margin calculations.  *See* Second Remand Redetermination at 2-12. Commerce therefore continued to calculate a dumping margin of 0.00 percent for OTS.  *Id.*; Second Remand Calc. Memo, Appx3077-3079, Appx83412-83415.

Commerce began by explaining the importance of examining the pricing behavior of a respondent faced with significant cost changes and Commerce's statutory obligation to minimize potential distortions to normal value by disregarding below-cost sales pursuant to 19 U.S.C. § 1677b(b)(1).  Second Remand Redetermination at 4-6.  Commerce explained that its practice does not place more weight on the pricing behavior in one market over the other, but instead focuses on whether quarterly sales prices and quarterly costs trend in the same direction more often than not.  *Id.* at 6-7.

On remand, Commerce adjusted its methodology to account for OTS's atypical dataset (*i.e.*, only one quarter of U.S. sales data). Commerce did so by expanding its linkage analysis of home market control numbers from five CONNUMs[1] to ten. *Id*. at 17-18.

As a result of its analysis of the additional five home market CONNUMs, Commerce determined that the record provides even more evidence that significant cost changes influenced OTS's pricing decisions, warranting an examination of OTS's costs in quarterly periods. *Id*. at 10. Commerce explained that its determination to apply its quarterly cost methodology is both more accurate than its standard methodology and was also in line with its linkage analyses in prior cases with atypical datasets. *Id*. at 13-20 (citing *Certain Welded Carbon Steel Pipe and Tube from Turkey: Notice of Final Results of Antidumping Duty Administrative Review,* 76 Fed. Reg. 76,939 (Dep't of Commerce Dec. 9, 2011) (*Welded Pipe from Türkiye*), and accompanying IDM at Comment 8*; see Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017,* 84 Fed. Reg. 27,762 (Dep't of Commerce June 14, 2019) (*Welded Line Pipe from Korea*), and accompanying IDM at Comment 12.).

Commerce also addressed the comments filed by OTS and Nucor regarding the draft results on the second remand redetermination. *See* OTS's Comments on Second Draft Remand, Appx3080-3082;[2] Nucor's Comments on Second Draft Remand, Appx3083-3090, Appx83416-83423. Nucor argued that Commerce failed to "address why the absence of data to be analyzed

---

[1] CONNUM is a contraction of "control number," a term that denotes "a unique product based on relevant physical characteristics." *See* Remand Order at 6 n.5. The reader may substitute "product" or "unique product" if preferred. *See id*.

[2] OTS stated that it "fully agrees with the Department's draft results, reaffirming its prior decision to use OTS's quarterly costs and calculate a dumping margin of 0.00 percent." *See* OTS's Comments on Second Draft Remand at 1.

for the U.S. market 'does not undermine the results,'" and alleged Commerce had acted contrary to its past practice.  *See* Nucor's Comments on Second Draft Remand at 5 (citing Remand Order at 24).  Commerce explained why its alternative approach is not inconsistent with its past practice and that Commerce is not limited to finding linkage only if can make comparisons in both the U.S. and home markets.  Second Remand Redetermination at 15-16.  Commerce explained why none of the cases relied upon by Nucor supported its proposition that Commerce was required to ignore evidence in the home market that OTS's quarterly costs and prices were reasonably correlated during the period of review simply because there was inconclusive evidence in the U.S. market.  *Id.*

Commerce also disagreed with Nucor that it "ignored" OTS's U.S. sales data.  *Id.* Instead, Commerce explained that it examined OTS's U.S. sales data and found that the data "did not and could not indicate whether linkage existed between OTS' costs and sales prices during the {period of review}" because they were only made during one quarter.  *Id.*  Commerce explained that the only sales price data on the record that could provide evidence regarding reasonable correlation between OTS's quarterly costs and its quarterly sales prices during the period of review are OTS's quarterly home market prices.  *Id.*  OTS's quarterly home market prices, therefore, were the relevant data to determine whether application of annual or shorter cost-averaging periods would result in a more accurate calculation of normal value.  *Id.*

## **ARGUMENT**

### I.    **Standard Of Review**

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law."  *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct.

Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## II.    Legal Framework for Quarterly Cost Methodology

In market economy cases, Commerce uses the price at which the foreign like product is sold in the comparison market in the ordinary course of trade as normal value. 19 U.S.C. §§ 1677b(a)(1)(A)-(C). The statute defines ordinary course of trade, 19 U.S.C. § 1677(15). Among other things, the statute requires that Commerce disregard sales that, pursuant to the sales-below-cost test set forth in 19 U.S.C. § 1677b(b)(1), are considered outside the ordinary course of trade.[3] In other words, Commerce must analyze whether sales were made below their cost of production *before* sales can be included in the pool of sales that can serve as a potential source of normal value. *See* 19 U.S.C. § 1677b(b)(1) (requiring Commerce to disregard sales that are made below the cost of production by comparing prices to weighted-average costs incurred.).

"The statute does not dictate the method by which Commerce may calculate costs of production, nor define the {time period over which the calculation is to be made}, and Commerce is afforded considerable discretion in formulating its practices in this regard." *Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1235 (Ct. Int'l Trade 2011) (internal quotation marks & citation omitted), *aff'd sub nom. Pastificio Garofalo, S.P.A. v. United States*, 469 F. App'x 901 (Fed. Cir. 2012).

When considering the appropriate approach to analyzing cost information, "Commerce often uses cost averaged over the entire period of review, unless there are significant cost

---

[3]  *See also* 19 U.S.C. § 1677b(e), which directs Commerce, in proceedings where there are no sales in the ordinary course of trade that can provide a basis for normal value, to instead use constructed value to determine normal value.

variations and those variations are linked to changes in sales prices." *Rebar Trade Action Coalition v. United States*, 503 F. Supp. 3d 1295, 1299 (Ct. Int'l Trade 2021). When those conditions are met, Commerce will use quarterly costs rather than annual weighted average costs. *Id*.

To determine whether the application of a quarterly costs methodology is appropriate, Commerce considers whether the respondent's data satisfies two criteria: (1) that the change in the costs during the period of review was significant; and (2) that sales made during the shorter cost-averaging periods could be reasonably linked with the costs during the same shorter cost-averaging periods. *Pastificio Lucio Garofalo*, 783 F. Supp. 2d at 1234-35.

Further, Commerce's linkage analysis for its quarterly cost methodology allows Commerce to ascertain whether significant cost changes influence a company's pricing decisions. This, in turn, informs whether significant cost changes are relevant to Commerce's inquiry on whether a company "engaged in underselling" during the period of review. *See Husteel Co. v. United States*, 520 F. Supp. 3d 1296, 1311 (Ct. Int'l Trade 2021).

## III.    Commerce's Second Remand Redetermination Should Be Sustained

Commerce's determination to rely on its quarterly cost methodology to calculate OTS's dumping margin complies with the Remand Order, is supported by substantial evidence, and is in accordance with law. We respectfully request that the Court sustain the second remand redetermination.

First, no party disputes that that the record demonstrates that OTS experienced significant cost changes during the period of review. Second Remand Redetermination at 14; *see* Nucor's Cmts. at 4 n.1. Because these cost changes were significant, Commerce examined whether there was evidence of a linkage between the cost changes and sales prices during the relevant period

and concluded that there was a reasonable correlation between them sufficient to show a

quarterly trend.  *See* Second Remand Redetermination at 2.  The Court remanded for further

explanation Commerce's decision to rely on its "normal" linkage analysis for a respondent with

one quarter of U.S. sales.  *See* Remand Order at 20-29.  In particular, the Court held that

Commerce did not provide an explanation for its apparent deviation from its normal linkage

analysis, in which Commerce examines the top five CONNUMs in both the U.S. and home

markets from quarter to quarter.  *Id.*

On remand, Commerce explained that because both the home market and U.S. market are

equally indicative of the extent to which the respondent's selling practice changes in response to

significant cost changes, Commerce could appropriately rely on affirmative evidence

demonstrating that OTS's quarterly costs and prices in the home market were reasonably

correlated during the period of review.  Second Remand Redetermination at 7.

The record demonstrated that OTS's top five CONNUMs by sales quantity in the home

market show correlation for [█] out of [█] quarters.  *Id.* at 10 (citing Analysis Memorandum at

Attachment 1).  Commerce's analysis of OTS's top five CONNUMs covered [█] percent of

OTS's home market sales and, therefore, gave it sufficient insight into whether significant cost

changes were relevant to the calculation of normal value.  *Id.*  Commerce explained that its

analysis provides sufficient insight into the respondent's pricing practices to conclude that the

significant cost changes influence OTS's pricing decisions; such that departing from

Commerce's use of an annualized average cost and applying its quarterly cost methodology

results in a more accurate calculation of normal value.  *Id.*

Further, Commerce explained that the fact that OTS's U.S. sales data could not indicate

whether linkage existed between OTS's costs and sales prices during the period of review did not

invalidate Commerce's linkage analysis of OTS's home market sales.  *Id*. at 13-18.  Nonetheless, to account for OTS's atypical dataset, Commerce expanded its linkage analysis to include the next five additional home market CONNUMs.  The inclusion of these additional CONNUMs further supported Commerce's finding of a correlation between quarterly sales prices and quarterly cost.  *Id*. at 9-12.

Commerce also explained that its expanded linkage analysis was consistent with prior proceedings where the respondent had atypical data points.  *Id*. at 9.  For example, in *Welded Pipe from Türkiye*, Commerce could not analyze linkage in the U.S. market because of data limitations.  *Welded Pipe from Türkiye,* 76 Fed. Reg. 76,939 and accompanying IDM at Comment 8.  Therefore, Commerce expanded its linkage analysis from five to ten home market CONNUMs, before determining that it was appropriate to utilize its quarterly cost methodology. *See id*.[4]

Similarly, in *Welded Line Pipe from Korea*, because there was no viable comparison market, Commerce based its significance and linkage analysis on ten U.S. CONNUMs.  *Welded Line Pipe from Korea*, 84 Fed. Reg. 27,762 and accompanying IDM at Comment 12.  Although Commerce ultimately determined that linkage did not exist in that proceeding, its decision to expand its analysis from five CONNUMs in the preliminary results to ten CONNUMs in the final results demonstrates Commerce's recognition of the need to ensure that normal value is calculated accurately.  *Id*.  These cases demonstrate that, where the data based on the top five

---

[4] In contrast to the *Ferrovanadium from Korea* case referenced in the first remand redetermination, in *Welded Pipe from Türkiye*, Commerce explained why it departed from its standard practice and analyzed the ten most frequently sold home market CONNUMs.  *See* Second Remand Redetermination at 9-10, 17-19 (citing *Ferrovanadium from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 14874 (Dep't of Commerce March 23, 2017), and accompanying IDM at Comment 8; *Welded Pipe from Türkiye*, IDM at Comment 8).

CONNUMS in each market do not permit a fulsome analysis of the CONNUMs in both markets, Commerce has a practice of expanding the number of CONNUMs examined to assess whether it is appropriate to depart from its use of an annualized average cost for use in the determination of normal value.

Similarly in this case, Commerce analyzed the top ten CONNUMs by sales quantity in the home market.  That analysis shows correlation for [ ▮ ] out of [ ▮ ] quarters, covering approximately [ ▮ ] percent of OTS's home market sales.  Second Remand Redetermination at 10.[5]  As a result, Commerce determined that the record provided further evidence that significant cost changes influence OTS's pricing decisions, and that the use of shorter cost-averaging periods results in a more accurate calculation of normal value and, in turn, a more accurate dumping margin.  *Id.*

Commerce explained that this approach was consistent with: (1) its statutory requirement to determine whether it is appropriate to rely on an annual average cost or shorter quarterly cost averaging periods *prior* to conducting the sales below cost test to determine the pool of potential sources of normal value; (2) its obligation to calculate normal value and, in turn, dumping margins as accurately as possible; and (3) its practice of considering the majority of comparisons in total to support its finding of linkage between a respondent's price and cost (*e.g.*, evaluating the top ten CONNUMs in the home market).  *Id.* at 12-17.

In sum, substantial evidence demonstrates that, for a majority of the comparisons of the quarterly weighted-average sales prices and the quarterly cost, linkage exists during the period of

---

[5]  Commerce "also note{d} that the analyses cover approximately [ ▮ ] percent and [ ▮ ] percent, respectively, of OTS combined U.S. and home market sales during the {period of review}."  *See* Second Remand Redetermination at 20 n.71 (citing Analysis Memorandum at Attachment 1 (Appx83414)).

review.  *Id*.  Therefore, Commerce reasonably determined that the use of shorter cost-averaging periods results in a more accurate calculation of normal value for OTS and, in turn, a more accurate dumping margin.  *Id*.

## IV.    <u>Contrary to Nucor's Arguments, Commerce Addressed the Court's Remand Order</u>

Nucor unpersuasively claims that Commerce failed to address two of the three questions identified in the Court's remand order: (1) "why it believes home market sales data alone allows it to render a conclusion about whether sales prices are reasonably linked to the cost of production," and (2) "why whatever test it applies can be trusted to produce reliable results."  *See* Nucor's Cmts. at 3-10 (citing Remand Order at 23-24).  As we demonstrate below, Commerce fully addressed the issues and questions identified in the Court's remand order.

Nucor argues that Commerce "failed to address {the} absence of information" for the U.S. market and "disregard{ed} whether there is any evidence of a cost-price linkage."  Nucor's Cmts. at 6-7.  Commerce determined that OTS's U.S. sales data were inconclusive and that the only sales price data on the record that could provide evidence (*i.e.*, home market prices), showed that OTS's quarterly costs were reasonably correlated with its quarterly sales prices during the period of review.  *See* Second Remand Redetermination at 15.  Nucor mistakenly concludes that, because Commerce could not conduct any analysis with regard to U.S. sales, it wholly disregarded the need for the U.S. dataset.

Commerce addressed Nucor's concerns by explaining that OTS's U.S. sales data could not indicate whether linkage existed between OTS's costs and sales prices during the period of review.  *Id*.  There is only one quarter of U.S. sales data.  *See id*. ("OTS provided its POR U.S. sales data on the record of this proceeding, and . . . all OTS' POR U.S. sales were in the same quarter"). Commerce plainly cannot evaluate quarterly sales data that does not exist.  *See id*.

(noting that because all U.S. sales were in the *same* quarter, such data could not indicate quarterly *changes*).  Commerce was not required to use or prioritize this inconclusive evidence over record evidence of linkage in the home market prices.  Commerce's reliance on evidence of linkage in the home market sales is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co*, 305 U.S. at 229.

Commerce's practice is to analyze whether record evidence indicates that changes in quarterly average sales prices and quarterly costs trend in the same direction more often than not (*i.e.*, whether there is linkage).  *See Welded Pipe from Türkiye*, IDM at Comment 8 ("{T}he prices and costs moved in the same direction for the majority of quarters, and that the slope lines for the quarterly costs and sales prices trended consistently.").  "Absent strong evidence showing that quarterly averaging periods are distortive, {Commerce's} practice is to use quarterly average cost periods when we determine it appropriate to deviate from our normal annual average methodology{.}" *Certain Pasta From Italy: Notice of Final Results of Antidumping Duty Changed Circumstances Review and Revocation, in Part*, 74 Fed. Reg. 41,120-02 (Dep't of Commerce Aug. 14, 2009), and accompanying IDM at Comment 5.

Nucor disagrees with Commerce's reliance on OTS's homes market information, which is the only information on the record that can reasonably demonstrate whether there is any linkage. *See* Nucor's Cmts. at 5.  But Nucor does not demonstrate that its "preferred outcome was the 'one and only reasonable' conclusion Commerce could reach in light of the record{,}" which is what it must show to "establish that Commerce's analysis {was} unreasonable." *Vandewater Int'l Inc. v. United States*, 589 F. Supp. 3d 1324, 1337 (Ct. Int'l Trade 2022) (citation omitted); *see also Consol. Int'l Automotive v. United States*, 809 F. Supp. 125, 130 (Ct. Int'l Trade 1992)

(rejecting party's argument where party failed to "support its objection to {the agency's} choice other than by conjecture ...").

Commerce agreed with Nucor that, under its normal linkage analysis, it would have analyzed the correlation between quarterly sales prices and quarterly costs for the top five CONNUMs sold by OTS in the United States, if the data had permitted it to do so.  *See* Second Remand Redetermination at 10.  This does not mean, however, that Commerce can or should ignore record evidence demonstrating linkage.  On the contrary, Commerce must base its determination on the record as a whole.  *See Rebar Trade*, 335 F. Supp. 3d at 1304 (citing *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006)) ("When reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.").  Commerce did so here and in a manner consistent with the statute and precedent.  *See* Second Remand Redetermination at 2-12.

Nucor next argues that Commerce's alternative linkage analysis is inconsistent with its past practice, arguing that the two administrative proceedings relied upon by Commerce as support for its analysis were factually distinguishable.  *See* Nucor's Cmts. at 6-8.  However, Nucor's characterization of Commerce's practice finds no support in these cases.

First, Nucor argues that in *Welded Pipe from Türkiye*, Commerce considered information regarding U.S. sales, whereas here, Nucor alleges, Commerce "completely disregarded the relevance of OTS's U.S. sales data to its linkage analysis."  Nucor's Cmts. at 7.  In fact, Commerce's finding in the second remand redetermination is similar to *Welded Pipe from Türkiye*.  In both cases, Commerce considered the respondent's U.S. sales data and, in both, found the evidence to be inconclusive.  *See* Second Remand Redetermination at 15; *Welded Pipe*

14

*from Türkiye*, IDM at Comment 8 n.14 ("{w}ithout comparable sales prices and costs {},

comparison of quarterly prices and cost trends for the linkage analysis {was} inconclusive").

Thus, as both here and in *Welded Pipe from Türkiye*, Commerce relied instead on the top ten

highest sales volume CONNUMs sold in the home market in the quarterly cost analysis.

      Nucor also claims that *Welded Pipe from Türkiye* supports the proposition that

Commerce must examine data in both the U.S. and home market to find that linkage between the

sales prices and costs exists.  Nucor Cmts. at 7-8.  However, in *Welded Pipe from Türkiye,*

Commerce did not state that Commerce had to make comparisons in both the U.S. and home

markets or find that a majority of comparisons supported a finding of linkage in both markets –

only that the majority of comparisons in total supported such a finding.  *See Welded Pipe from

Türkiye,* IDM at Comment 8 ("{T}he prices and costs moved in the same direction for the

*majority of quarters*...").  Any claim that Commerce is obligated to make comparisons in both

the U.S. and home markets, regardless of data limitations, is unsupported by *Welded Pipe from

Türkiye* or any other cases cited in Nucor's brief.

      Second, Nucor argues that because "no home market or third country sales prices were

used in the dumping calculation, the relevance of any cost-price linkage in the home/third

country market to the dumping calculation was minimized."  Nucor's Cmts. at 7 (citing *Welded

Line Pipe from Korea*, IDM at Comment 12).  However, Nucor does not explain how Commerce

*minimized* its linkage analysis in *Welded Line Pipe from Korea*, nor does it meaningfully

distinguish Commerce's actions in that case from this proceeding.  *Id*.  Instead, Nucor asserts

that Commerce ignored "whether there is any evidence of a cost-price linkage" and "ignore{d}

factual intricacies."  *Id*.  But, as explained above, Nucor has not meaningfully identified any

impermissible departure from past practice.  *Id*.

As explained above, Commerce is not obligated under its linkage analysis to place more weight on the pricing practices in one market, regardless of data limitations. Nucor has not identified any support for a contrary conclusion. *See* Nucor's Cmts. at 8-9. Indeed, Nucor itself cites proceedings where Commerce found linkage based on evidence of correlation in a single market, which illustrates that Commerce's practice is to consider the majority of comparisons regardless of market. *Id.*; *Welded Pipe from Türkiye,* IDM at Comment 8 (relying on "ten of the most frequently sold home market CONNUMs show clear evidence of linkage"); *Certain Pasta From Italy*, 78 Fed. Reg. 9,364 (Dep't Commerce Feb. 8, 2013), and accompanying IDM at Comment 3 (determining that linkage was met despite evidence demonstrating that none of the five U.S. market CONNUMs analyzed were reasonably correlated). Accordingly, Nucor has failed to demonstrate that Commerce acted arbitrarily or beyond its discretion in relying on the majority of comparisons to support its finding.

Contrary to Nucor's argument, Commerce addressed the Court's order that it "explain how its use of the quarterly cost methodology can be trusted to produce reliable results." *See* Nucor's Cmts. at 9-10. Commerce expanded the universe of sales to include the next five additional CONNUMs in its analysis. This additional data further bolstered Commerce's finding of a correlation between the changing costs and sales prices from quarter to quarter. *See* Second Remand Redetermination at 9-12; *see also* Second Remand Calc. Memo at Appx83415 (showing correlation for the top five CONNUMS in [ ▮ ] out of [ ▮ ] quarters (*i.e.* [ ▮ ]%), and correlation for the top ten CONNUMS in [ ▮ ] out of [ ▮ ] quarters (*i.e.* [ ▮ ]%). Nucor cites no record evidence that undermines Commerce's analysis and findings with respect to OTS's reported information. Instead, Nucor speculates that OTS's sales behavior *might* have been different in the U.S. market. But speculation is not record evidence that undermines Commerce's

determination.  *See OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019)

("'Mere speculation' is not substantial evidence." (quoting *Intell. Ventures I LLC v. Motorola*

*Mobility LLC*, 870 F.3d 1320, 1331 (Fed. Cir. 2017))).

　　　To further support its determination to use its quarterly cost methodology, Commerce

evaluated the [ ███ ] CONNUMs that served as the basis for normal value and that Nucor had

previously suggested should be the focus of Commerce's quarterly cost analysis.  Second

Remand Redetermination at 11-12 (citing Analysis Memo at Attachments I and II); *see also*

Remand Order at 25-27.  Commerce noted that [ ███ ] of the CONNUMs [ ████████ ] the

top ten home market sales by quantity and that the remaining CONNUM was among the [ ██

████████████████ ] previous analysis.  Second Remand Redetermination at 11-12.

Regardless, Commerce's analysis of these [ ███ ] CONNUMs revealed that a correlation

between significant cost changes and prices for [ ███ ] of the [ ███ ] quarters, which indicated that

the significant cost changes affected the pricing decisions for the [ ███ ] CONNUMs suggested

by Nucor in the first remand redetermination.  *Id.*

　　　Notably, Nucor did not provide an alternative methodology for Commerce to consider in

the second remand redetermination.  It continues to argue for a contrary result without citing any

evidence or precedent that would require Commerce to change course.  Based on affirmative

evidence of linkage on the record, as well as the significant volume of sales Commerce

examined, Commerce reasonably continued to find that its linkage analysis based on OTS's

quarterly costs and sales prices in the home market are a sufficiently reliable indicator of linkage

for OTS during the period of review.  Because Commerce's second remand redetermination

complies with this Court's remand order, is supported by substantial evidence, and is in

accordance with law, it should be sustained.

**CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's second remand redetermination and enter judgment in favor of the United States.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/ Augustus Golden
OF COUNSEL:                          AUGUSTUS J. GOLDEN
ASHLANDE GELIN                       Trial Attorney
Attorney                             U.S. Department of Justice
Office of the Chief Counsel          Civil Division
  for Trade Enforcement and Compliance   Commercial Litigation Branch
U.S. Department of Commerce          P.O. Box 480
Washington, D.C.                     Ben Franklin Station
                                     Washington, D.C. 20044
                                     Tel: (202) 305-5915
                                     Fax: (202) 307-0972
                                     Email: augustus.j.golden@usdoj.gov

March 17, 2025                       Attorneys for Defendant