Slip Op. 25-116

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **OFFICINE TECNOSIDER SRL,** | |
| **Plaintiff,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | **Court No. 23-00001** |
| **Defendant,** | **PUBLIC VERSION** |
| **and** | |
| **NUCOR CORPORATION,** | |
| **Defendant-Intervenor.** | |

## OPINION

[Sustaining Commerce's application of its quarterly cost methodology.]

Dated: September 3, 2025

Daniel J. Cannistra, and Pierce J. Lee, Crowell & Moring LLP, of Washington, DC, for Plaintiff Officine Tecnosider Srl.

Augustus J. Golden, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. On the brief were Yaakov M. Roth, Acting Assistant Attorney General, Patricia M. McCarthy, Director, Commercial Litigation Branch, Tara K. Hogan, Assistant Director, Commercial Litigation Branch. Of counsel were Mykhaylo A. Gryzlov, and Paul. H. Thornton, III, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Stephanie M. Bell, Alan H. Price, Christopher B. Weld, Jeffrey O. Frank, and Stephen A. Morrison, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation.

Kelly, Judge: Before the Court is the U.S. Department of Commerce's ("Commerce") Final Results of Second Redetermination Pursuant to Court Remand, Jan. 15, 2025, ECF No. 53-1 ("Second Remand Results") pursuant to this Court's remand order in its 2020–21 administrative review of the antidumping order for steel plate from Italy. See Officine Tecnosider SRL v. United States, No. 1:23-CV-00001 (SAV), 2024 WL 4212339 (Ct. Int'l Trade Sept. 17, 2024) ("Officine I"); see also Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021, 87 Fed. Reg. 75,219 (Dep't Commerce Dec. 8, 2022) ("Final Results"), and accompanying Issues and Decisions Mem. ("IDM"), Nov. 22, 2023, ECF No. 44. At issue is whether Commerce, in the Second Remand Results, adequately explains its decision to apply a quarterly cost methodology to Plaintiff, Officine Tecnosider SRL ("OTS"), where there is only one quarter of U.S. sales data and whether the use of the quarterly cost methodology will produce reliable and accurate results. On remand, Commerce analyzed five additional home market control numbers to account for the atypical data set and continues to find that its use of the quarterly cost methodology is warranted. For the reasons that follow, Commerce's Second Remand Results are sustained.

Court No. 23-00001                                                      Page 3
**PUBLIC VERSION**

## BACKGROUND[1]

The Court presumes familiarity with the facts as set forth in <u>Officine I</u> and will only recount those pertinent to the instant matter. <u>See generally</u> <u>Officine I</u>, 2024 WL 4212339. Plaintiff challenges Commerce's Final Results in the administrative review of the antidumping order on certain carbon and alloy steel cut-to-length plate from Italy, covering entries from May 1, 2020 through April 30, 2021. <u>See</u> <u>Final Results</u>; IDM; <u>see also</u> Compl., Jan. 25, 2023, ECF No. 11. Plaintiff filed its Motion for Judgment on the Agency Record on March 17, 2023. <u>See</u> Pl. Mot. for J. on the Agency Rec., Mar. 17, 2023, ECF No. 24. Subsequently, Defendant filed a motion to remand the case, which this Court granted on May 15, 2023. <u>See</u> Unopposed Mot. to Voluntarily Remand, May 8, 2023, ECF No. 26; <u>see also</u> Order, May 15, 2023, ECF No. 29 ("Remand Order").

Commerce filed its <u>Remand Results</u> on September 12, 2023. Final Results of Redetermination Pursuant to Ct. Remand Order, Sept. 12, 2023, ECF No. 32 ("<u>Remand Results</u>"). Commerce concluded "record evidence shows that OTS experienced significant cost changes (i.e., changes that exceeded 25 percent) between the high and low quarterly COM for the majority of the five highest sales volume control numbers (CONNUM) in the comparison and U.S. markets during the POR."

---

[1] This case was originally assigned to Judge Stephen A. Vaden on February 8, 2023. Pursuant to USCIT Rule 77(e)(4) and 28 U.S.C. § 253(c), the case was reassigned to Judge Claire R. Kelly on July 7, 2025.

Court No. 23-00001                                                    Page 4
**PUBLIC VERSION**

Id. at 4.  Commerce concluded that as Plaintiff's production costs increased or decreased, the prices Plaintiff charged in Italy did the same, i.e., there was a reasonable correlation and linkage between the cost of production and the sales prices.  Id. at 4–5, 10.  Because of the existence of a reasonable correlation and linkage, Commerce determined that it was appropriate to perform its calculations using the alternative quarterly cost methodology.  Id. at 5.  As a result of using the quarterly cost methodology, Plaintiff's weighted-average dumping margin was 0.00 percent.  Id. at 12–13.  Defendant-Intervenor opposed Commerce's Remand Results, arguing that Commerce failed to "meaningfully discuss or consider the record before it and how the specific facts of this case support its cost methodology."  Def.-Intv. Nucor Corp.'s Cmts. on Final Results of Redetermination Pursuant to Court Remand at 5, Oct. 14, 2023, ECF No. 38.  This Court remanded Commerce's Remand Results for Commerce to conduct a new analysis to determine if using its quarterly cost methodology is warranted.  Officine I, 2024 WL 4212339 at *11.  Specifically, this Court ordered Commerce to "explain why its test for applying a quarterly cost methodology is adequate to address a situation where there is only one quarter of U.S. sales data" and "link the facts it has found to the choices it makes to explain why the results of its linkage analysis engender confidence."  Id. at *10–*11.

Commerce filed its <u>Second Remand Results</u> on January 15, 2025. <u>See generally</u> <u>Second Remand Results</u>. Defendant-Intervenor filed its comments in opposition to the <u>Second Remand Results</u> and its reply comments on February 19, 2025 and April 21, 2025, respectively. <u>See</u> Def. Intv. Nucor Corp.'s Cmts. in Opp'n to the Final Results of Second Redetermination Pursuant to Court Remand, Feb. 19, 2025, ECF No. 60 ("Def. Intv. Cmts."); <u>see also</u> Def. Intv. Nucor Corp.'s Reply Cmts., Apr. 21, 2025, ECF No. 65 ("Def. Intv. Reply"). Defendant filed its response to Defendant-Intervenor's comments on March 19, 2025, and Plaintiff filed its response to Defendant-Intervenor's comments on April 4, 2025. <u>See</u> Def.'s Resp. to Cmts. on the Second Remand Redetermination, Mar. 19, 2025, ECF No. 61 ("Def. Resp."); <u>see also</u> Pl.'s Resp. to Cmts. on the Second Remand Redetermination, Apr. 4, 2025, ECF No. 63 ("Pl. Resp.").

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018) and 28 U.S.C. § 1581(c) (2018), which grant the Court authority to review actions contesting the final determination in an administrative review of an antidumping duty order. The Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Huaiyin Foreign Trade Corp. (30) v. United States</u>, 322 F.3d 1369, 1374 (Fed. Cir.

**PUBLIC VERSION**

2003) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  The Court

reviews the record made before the agency as a whole and may not supply a reasoned

basis for the agency's action that the agency itself has not given.  <u>See</u> 19 U.S.C.

§ 1516a(b)(1)–(2); <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947).  The Court will,

however, "uphold a decision of less than ideal clarity if the agency's path may

reasonably be discerned." <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>,

419 U.S. 281, 286 (1974).  "The results of a redetermination pursuant to court remand

are also reviewed 'for compliance with the court's remand order.'" <u>Xinjiamei</u>

<u>Furniture (Zhangzhou) Co. v. United States</u>, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l

Trade 2014) (quoting <u>Nakornthai Strip Mill Public Co. v. United States</u>, 32 CIT 1272,

1274 (Ct. Int'l Trade 2008)).

## DISCUSSION

On remand, Commerce continues to calculate Plaintiff's weighted-average

dumping margin for the period of review ("POR") using Commerce's quarterly cost

methodology.  <u>Second Remand Results</u> at 7–12.  Defendant-Intervenor argues

Commerce failed to (1) explain why home market sales data alone allows Commerce

to conclude sales prices are reasonably linked to cost of production, and (2) explain

how its use of the quarterly cost methodology is reliable given the facts of this case.

Def. Intv. Cmts at 3–10.  Defendant and Plaintiff argue Commerce's Second Remand

Results comply with this Court's Remand Order and are supported by substantial

**PUBLIC VERSION**

evidence and thus should be sustained.  <u>See</u> Def. Resp. at 8–17; <u>see also</u> Pl. Resp. at 3–9.[2]

     Dumping involves the sale of merchandise "in the United States at less than its fair value." 19 U.S.C. § 1673(1).  The amount of dumping equals "the amount by which the normal value exceeds the export price … for the merchandise." 19 U.S.C. § 1673(2)(B).  In a dumping investigation or review Commerce determines whether the subject merchandise is being sold at less-than-fair-value by comparing the price the merchandise is sold in the United States to the normal value of the merchandise. 19 U.S.C. § 1677b(a).  Normal value is the home market price, and the export price is the U.S. price.  <u>See</u> 19 U.S.C. § 1677b(a); 19 U.S.C § 1677a(a).

     In a market economy case, when calculating normal value Commerce must use the price at which the foreign like product is sold in the comparison market in the ordinary course of trade.  19 U.S.C. § 1677b(a)(1)(A)-(C).[3]  Commerce calculates normal value based on home market sales "in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i).  However, Commerce disregards home market sales made at prices below the cost of production. 19 U.S.C. §§ 1677b(b)(1), 1677(15)(A)).  Thus,

---

[2] Defendant-Intervenor initially supported Commerce's determination in this matter, however after Commerce requested a remand and issued its <u>Remand Results</u>, Defendant-Intervenor opposed Commerce's <u>Remand Results</u> and opposes the <u>Second Remand Results</u>.  <u>See</u> <u>Remand Results</u>; <u>Second Remand Results</u>; Def. Intv. Cmts.

[3] Ordinary course of trade is defined as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15).

Commerce must determine the cost of production to choose appropriate home market sales against which to compare sales in the U.S. market.

There is no set time period in which Commerce must calculate the cost of production, and thus no time period over which a respondent's costs must be averaged.  See 19 U.S.C. § 1677b(b) (discussing sales related to cost of production with no set time period in which those sales must have been made); see also Pastificio Lucio Garofalo, S.p.A. v. United States, 35 CIT 630, 633 (Ct. Int'l Trade 2011) aff'd sub nom. Pastificio Lucio Garofalo, S.P.A. v. United States, 469 F. App'x 901 (Fed. Cir. 2012).  Commerce normally calculates a weighted-average cost for the period of review to determine cost of production, but it may depart from its normal practice when Commerce's normal method "would distort the dumping analysis due to significant cost changes."  See Officine I, 2024 WL 4212339 at *5; see also Pastificio, 35 CIT at 634.

Commerce uses its quarterly cost methodology if it finds (1) "there are significant changes in the cost of production during the Period of Review" and (2) "that sales made during the shorter cost-averaging periods [can] be reasonably linked" with the cost of production during the same periods.  Officine I, 2024 WL 4212339 at *5 (internal citations and quotations omitted).  According to Commerce's practice, for a change in the cost of production to be considered significant, the difference between the highest and lowest costs of production during the period of review must be at least 25 percent.  Id. (citing Stainless Steel Plate in Coils from

<u>Belgium: Final Results of Antidumping Duty Administrative Review</u>, 73 Fed. Reg. 75,398 (Dep't Commerce Dec. 11, 2008), and accompanying Issues and Decisions Memorandum at cmt. 4).  Next, Commerce analyzes whether changes in sales prices are reasonably linked to the cost of production by analyzing the data to determine if "changes in selling prices reasonably correlate to changes in unit costs."  <u>Id.</u> (quoting <u>Certain Welded Carbon Steel Pipe and Tube from Turkey: Notice of Final Results of Antidumping Duty Administrative Review ("Tube from Turkey")</u>, 76 Fed. Reg. 76,939 (Dep't Commerce Dec. 9, 2011)).  Commerce typically analyzes cost and price trends for the five most frequently sold control numbers[4] in both the home market as well as the U.S. market.  <u>Id.</u> (citing <u>Tube from Turkey</u> IDM at 4).  Commerce examines the quarterly average prices and cost of production for reasonable linkage.  <u>Id.</u> at *6 (citing <u>Tube from Turkey</u> IDM at 4).  In conducting its linkage analysis, Commerce looks at, inter alia:

> (1) the relative magnitude of the changes in the price and cost; (2) whether, from quarter-to-quarter, the prices and costs moved in the same direction; and (3) whether the respective slope lines for the quarterly prices and costs consistently trended together.

---

[4] The term "control number" or "CONNUM" denotes a unique product based on relevant physical characteristics.  To ensure that Commerce is comparing like products in the home and U.S. markets, it asks respondents to sort merchandise according to key differentiating categories, with each number in the product's control number corresponding to physical characteristic groupings particular to the merchandise under review.  <u>Xi'an Metals & Minerals Imp. & Exp. Co. v. United States</u>, 520 F. Supp. 3d 1314, 1321 n.4 (Ct. Int'l Trade 2021).

Id. (citing Ferrovanadium from the Republic of Korea: Final Determination of Sales at Less Than Fair Value, 82 FR 14874-01, IDM at 25).  In Officine I, this Court ordered Commerce to "explain why its test for applying a quarterly cost methodology is adequate to address a situation where there is only one quarter of U.S. sales data" and "link the facts it has found to the choices it makes to explain why the results of its linkage analysis engender confidence." Id. at *10–*11.

Here, Commerce adequately explains why its analysis of only home market sales data allows Commerce to find that sales prices are reasonably linked to the cost of production.  Specifically, Commerce analyzed Plaintiff's U.S. sales and determined it could not use them to conduct a correlation analysis because all the U.S. sales were made in one quarter and thus were not probative of whether changes in costs were correlated to changes in sales prices from quarter to quarter.  Second Remand Results at 15 (citing Draft Second Remand Results at 12, APPX 83409).  Commerce found that because Plaintiff's U.S. sales data was "inconclusive," the only reliable record information to calculate linkage would be Plaintiff's quarterly home market prices. Id. at 15.[5]  Commerce explains that "because all OTS' POR U.S. sales were in the

---

[5] In Tube from Turkey, Commerce conducted its quarterly cost analysis using the top ten highest sales volume control numbers sold in the home market because the respondent's U.S. sales data, specifically three quarters of data, did not allow for a linkage analysis.  See Tube from Turkey IDM at cmt. 8 n. 14.  As Commerce explains; here, it similarly analyzed Plaintiff's U.S. sales data and concluded that because

(footnote continued)

same quarter, such sales data could not indicate or provide evidence as to whether OTS' quarterly changes in costs generally correlated with quarterly changes in sales prices during the POR." Id. at 15, 19–20.  It is beyond dispute that data from a singular quarter would not allow Commerce to analyze changes from quarter to quarter as there would be no other U.S. sales data to be used as a comparator. Although Defendant-Intervenor argues Commerce "has completely disregarded the relevance of [Plaintiff's] U.S. sales data to its linkage analysis," Def. Intv. Resp. at 7, Commerce explains that it did not ignore U.S. sales data, but rather it analyzed Plaintiff's U.S. sales and found the data does not permit a linkage analysis over the period of review, while the home market data allows for a linkage analysis and overwhelmingly shows that Plaintiff's costs and prices are linked.[6]  Second Remand Results 17–18, 20.

---

there were no quarters of comparisons for U.S. prices, Commerce could not follow its normal practice, it analyzed the top ten control numbers from the home market to analyze linkage between Plaintiff's quarterly cost of production and sales prices. Second Remand Results at 17.

[6] Defendant-Intervenor also argues that "just as the calculation of margins in antidumping proceedings requires a comparison of sales prices in the U.S. market and the home market, the determination of trends in U.S. market and home market sales to the COM requires an analysis of both markets."  Def. Intv. Resp. at 8. However, while Commerce must look to both markets to determine a dumping margin, here Defendant-Intervenor fails to explain why Commerce must look to both markets to determine the cost of production.  As Commerce explains, Commerce "would normally consider quarterly trends in both markets, and we would do so here if the data permitted such comparisons; however, the record of this review only

(footnote continued)

Court No. 23-00001                                                                      Page 12
**PUBLIC VERSION**

      Further, in order to ensure the reliability of its methodology Commerce expanded its analysis from the top five home market control numbers to the top ten home market control numbers, accounting for an analysis of a majority of Plaintiff's home market sales.[7]  As Commerce explains, it "seeks to analyze CONNUMs with the largest sales volumes in each market because an analysis of those CONNUMs is likely to provide the greatest insight into a respondent's pricing practices."  Id. at 20.  It is reasonably discernible that Commerce increased the volume of home market sales in its analysis to compensate for the unavailability of U.S. data to analyze.[8]  Id. (noting that Commerce expanded its analysis from the top five control numbers in the home market to the top ten).  Commerce reasons the large volume of Plaintiff's home market sales showing that quarterly sales prices and costs "more often than not" trended in the same direction during the POR, leads to the conclusion that there is linkage between prices and the cost of production.  Id.  Commerce's typical practice

---

provides us with conclusive information about quarterly trends in the home market, and, thus, we are unable to follow our usual practice to determine whether linkage exists."  Second Remand Results at 15–16.  Because there is no mandate that Commerce look at both markets, and because Commerce, as discussed above, adequately explains that this data set required it to alter its methodology, Commerce's use of its quarterly methodology is reasonable.

[7] Specifically, Commerce's analysis of the top five home market control numbers accounted for approximately [[    ]] percent of home market sales during the POR, while the expansion to the top 10 home market control number accounts for approximately [[    ]] percent of Plaintiff's home market sales during the POR.  Id. at 20.

[8]  By adding five additional home market control numbers, Commerce expanded its analysis to include nearly [[    ]] percent of Plaintiff's home market sales, accounting for the lack of U.S. sales data by examining nearly all home sales data.  Id.

Court No. 23-00001                                                                                    Page 13
**PUBLIC VERSION**

is to gain insights on linkage from both home market and U.S. market sales.  Id.  It is reasonably discernible that in the absence of U.S. market data, Commerce sought further confirmation of its insights based on a larger amount of home market sales alone.  Id. (explaining that Commerce expanded its analysis to include almost all of Plaintiff's home market sales).  Thus, Commerce has explained its approach and its conclusions as to why its quarterly methodology produces reasonable and reliable results.

## CONCLUSION

For the foregoing reasons, Commerce's Second Remand Results are supported by substantial evidence, comply with the Court's remand order, see ECF No. 52, and are therefore sustained.  Judgment will enter accordingly.

                                                                        /s/ Claire R. Kelly
                                                                        Claire R. Kelly, Judge

Dated:        September 3, 2025
              New York, New York